## Commonwealth *v.* Bausewine, Appellant.

Argued March 25, 1946. Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON, STEARNE and JONES, JJ.

*Thomas D. McBride,* with him *Edward B. Duffy,* for appellant.

*David E. Groshens,* Assistant District Attorney, with him *Frederick B. Smillie,* District Attorney, for appellee.

OPINION BY MR. JUSTICE DREW, April 12, 1946:

Defendant, George Bausewine, was tried and found guilty of bribery and nonfeasance in office when Chief of Police of the Borough of Norristown. His motions in arrest of judgment and for a new trial having been denied, he was sentenced in each case to pay the cost of prosecution and a fine of $100 and undergo imprisonment in the Montgomery County Prison for not less than four months and not more than twenty-three months until the sentence is complied with; the sentences to run concurrently. On appeal, the learned Superior Court sustained the conviction, but, finding the sentences improper, remanded the record to the court below for resentence according to law (156 Pa. Superior Ct. 535, 40 A. 2d 919). Defendant's petition for the allowance of an appeal to this Court having been granted, these appeals followed.

It is argued on behalf of defendant that the Chief of Police of Norristown is an "officer of this Commonwealth" within the purview of section 303 of the Penal Code (Act of June 24, 1939, P. L. 872). For that reason, he contends, it was improper to proceed against

him at common law. Defendant was charged with bribery at common law, as well as under the statute, but it is clear that at the trial the Commonwealth relied upon the former charges of which he was convicted and sentenced. Section 303 provides, inter alia: "Whoever shall directly or indirectly . . . give or make any . . . payment . . . of any money . . . in order to obtain or influence the vote, opinion, verdict, award, judgment, decree, or behavior of any member of the General Assembly or *any officer of this Commonwealth,* judge, juror, justice, referee or arbitrator, in any bill, action, suit, complaint, indictment, controversy, matter or thing whatsoever, depending on which shall depend before him . . . is guilty of bribery, a misdemeanor . . ." (Italics added). If a borough chief of police is an "officer of this Commonwealth" within the meaning of this section, then defendant obviously could not be indicted, tried or convicted legally on the charge of bribery at common law, because of the provisions of section 1104 of the Penal Code. That section provides: "In all cases where a remedy is provided or duty enjoined, or any thing directed to be done by the penal provisions of any act of assembly, the direction of said act shall be strictly pursued; and no penalty shall be inflicted, or anything done agreeably to the provisions of the common law in such cases, further than shall be necessary for carrying such act into effect."

A careful study of section 303, however, convinces us that it was the legislative intent to single out those officers directly responsible to the government of the Commonwealth of Pennsylvania in its state-wide sense who prove unfaithful in the exercise of the sovereignty of the Commonwealth. It was not the intendment to include in this section such local public officer as a borough chief of police. In this connection, we agree with President Judge BALDRIGE that: "Section 303 . . . relates to a thing to be attained or influenced by a bribe. 'Vote, opinion, verdict, award, judgment, decree or be-

havior' are specified. A chief of police has no official relation with any of those matters. Those who come within the provisions of that section are legislators, judges, jurors, etc., who make up the legislative and judicial branches of our government. They are the officers of the commonwealth within the purview of the statute. Nothing is said in this section about municipal officers. Then we go further and examine sections 304 and 305, 18 PS §§4304, 4305, dealing with a corrupt solicitation and the practice of corrupt solicitation of 'municipal officers' and 'public officers of the State or of any political subdivision thereof'. If the legislature had meant to embrace within section 303 municipal officers, it would have said so definitely as it did in sections 304 and 305." Therefore, the argument of defendant is without merit.

A consideration of defendant's contention that the evidence was insufficient as a matter of law to support his conviction of bribery and nonfeasance in office presents a more serious matter. The testimony upon which the Commonwealth primarily relies was given by two witnesses, McCafferty and Gilinger. The former was chief steward of the Fraternal Order of the Orioles, a social club, whose duties were to purchase supplies, take care of the help and to look after the general business of the club. He was an uncertain and unreliable witness, who had been discharged by the club for insobriety and rehired shortly before defendant was indicted. The latter witness, Gilinger, chairman of the Orioles' house committee, is a brother-in-law of one Captain Butler, second in command of the Norristown Police Force, against whom defendant, a short time before the latter's indictment in the present action, had made a formal complaint to the borough officials, charging Butler, a member of the Orioles, with having falsified his application for a position on the force and with neglect of duty. It was Butler's attorney, as a result of information which he had received from his client, who communicated with

the District Attorney concerning matters which brought about the instant case.

A view of the record shows that defendant, now seventy-seven years of age, was Chief of Police of Norristown for fourteen years prior to the trial and still holds that office. Previous to that time he had retired on pension from the Philadelphia Police Department, where he had served for many years. The Orioles, in its private clubhouse, in Norristown, maintained and operated eight slot machines during 1943 and 1944. These netted about $2750 per month. Commonwealth's witness, McCafferty, testified that every month from January 1943 to and including January 1944, he put $50 in cash in an envelope and delivered it to defendant at the latter's home. The Orioles' house committee minutes of February 7, 1944, which were offered in evidence by the Commonwealth without objection, showed the following: "Agreed that as this Club is operated in a strictly legitimate manner, no money to be paid as so-called protection money." McCafferty further stated that on March 10, 1944, at about six o'clock in the evening, he received a telephone call from defendant asking him how he was and where he had been. McCafferty answered: "Seven o'clock tonight", and defendant replied: "Okay". This witness testified also that shortly after seven that evening John Gilinger drove him to defendant's home and he, McCafferty, delivered to defendant personally an envelope containing $50 in cash. Gilinger corroborated McCafferty as to this last payment to defendant. McCafferty's veracity was seriously affected by the fact that when he was called to the office of the District Attorney, following the visit there of Butler's attorney, he informed that officer on March 16, 1944, that he had paid the $50 to defendant on but three occasions, the last time on March 14, 1944.

Defendant was not a member of the Orioles, nor was he ever seen at its clubhouse. No testimony was adduced as to whose money it was that was accepted by defend-

ant. Neither was any evidence offered that defendant had any knowledge regarding the existence of these slot machines, or that any of the police officers in the department had brought the matter to his attention, or that he promised in any way to fail in the performance of his official duties as chief of police, or that he had had any conversation with McCafferty, Gilinger or any officers or members of the Orioles with reference to the machines or to the acceptance of any money whatever. In fact, McCafferty when asked on cross-examination whether he had said: "the purpose of paying the fifty dollars was to protect the Orioles, in the playing of these machines", replied: "I didn't say that. I don't know, wasn't any statement made."

The evidence presented by the Commonwealth to charge defendant with these offenses was obviously circumstantial. The facts shown were consistent with defendant's innocence, and could reasonably be explained on a theory other than that of guilt. Although the Commonwealth produced the account book of the club showing the receipts from the slot machines, no effort whatever was made to prove that fifty dollars a month was paid out of these receipts of the club to defendant or anyone else. The minutes of the house committee, rather than substantiate the Commonwealth's contention that the money was paid to defendant to incline him to protect the operation of the machines, tend to disprove that very fact. The minutes indicate that no money had ever been paid to anyone as protection money, and that no money was to be paid then or in the future.

The burden devolved upon the Commonwealth to overcome the presumption of defendant's innocence and to establish, beyond a reasonable doubt, the fact that he had accepted money to influence him as a police officer to act contrary to known rules of honesty and integrity. While the mere fact that the evidence adduced is wholly circumstantial is not fatal to the Commonwealth's case (*Commonwealth v. DePetro,* 350 Pa. 567, 577, 39 A. 2d

838), yet it must be remembered that guilt must be proved and not conjectured. The reasonable inference of guilt must be based on facts and conditions proved; it cannot rest solely on suspicion or surmise. These do not take the place of testimony. The facts and circum-stances proved must, in order to warrant a conviction, be such as to establish the guilt of the defendant, not necessarily beyond a moral certainty, nor as being abso-lutely incompatible with his innocence, but at least be-yond a reasonable doubt. The circumstantial evidence in this case is not such "as reasonably and naturally to justify an inference of the guilt of the accused, . . . and of such volume and quality as to overcome the presump-tion of innocence and satisfy the jury of the accused's guilt beyond a reasonable doubt": *Commonwealth v. Marino,* 142 Pa. Superior Ct. 327, 16 A. 2d 314; *Com-monwealth v. Libonati,* 346 Pa. 504, 508, 31 A. 2d 95; *Commonwealth v. Holt,* 350 Pa. 375, 387. The testimony adduced by the Commonwealth is weak and inconclusive.

The clear and unequivocal character of the testimony offered by the defendant and produced in his behalf sharply contrasts with the weak and unconvincing char-acter of the testimony offered in behalf of the Common-wealth's case. He testified emphatically that he never received any money from McCafferty at any time, and did not even know him, except to see him. Much of de-fendant's evidence was devoted to an attack upon the credibility of the Commonwealth's witnesses by way of showing motive, and the affirmative defense of alibi. He produced a number of witnesses as to his good reputa-tion and several to show that on March 14, 1944 (the time when McCafferty originally stated the last pay-ment was made to him) he was away from his residence in the company of a number of respectable citizens; and also that on March 10, 1944 (the date upon which McCafferty finally concluded he gave the last $50 to him) he also was not at home. A number of officers and policemen of the borough were called by defendant to

show that they had never received any instructions from him not to raid the club, or to protect it in any way.

We are all satisfied that the evidence adduced by the Commonwealth was clearly insufficient to establish defendant's guilt of the offense of bribery, and since the charge of nonfeasance depended solely upon whether or not defendant accepted a bribe to protect the Orioles' club, the conviction on the charge of nonfeasance must also fall.

For these reasons, the judgments are reversed, and defendant is discharged.