Commonwealth *v.* Nasuti, Appellant.

Argued April 18, 1956. Before STERN, C. J., JONES, BELL, CHIDSEY, MUSMANNO and ARNOLD, JJ.

*Edward W. Furia,* with him *Furia & DiCintio,* for appellant.

*Christopher F. Edley,* Assistant District Attorney, with him *James N. Lafferty,* Deputy District Attorney, and *Victor H. Blanc,* District Attorney, for appellee.

438

OPINION BY MR. CHIEF JUSTICE HORACE STERN, June 25, 1956:

The jury having found defendant, Richard J. Nasuti, guilty of the crime of arson, the trial court, and the Superior Court on appeal, in a unanimous opinion by Judge HIRT (180 Pa. Superior Ct. 279, 119 A. 2d 642), affirmed the conviction.

For a conviction in an arson case three facts must be established: (1) that there was a fire; (2) that it was of incendiary origin; (3) that the defendant was the guilty party. The questions involved in the present appeal relate to the second and third of these requirements, appellant claiming that, as to the second, the court erred in admitting expert testimony to prove that it was an incendiary and not an accidental fire, and, as to the third, that the proof was insufficient to warrant a finding that the defendant had committed the crime.

Defendant, together with his wife, operated a restaurant at 1338 West Columbia Avenue, Philadelphia, a small room 16 to 18 feet wide and 30 to 32 feet in length, being the easternmost of ten stores on the first floor in the Hardt Building at the Southeast Corner of Broad Street and Columbia Avenue. It was not apparently a profitable enterprise, at least defendant himself did not draw any salary, his wife took $50.00 a week out of the receipts, and that was the total they received from the business. Their lease was for five years dating from August, 1951; the fire occurred approximately seven months thereafter.

Sergeant Walsh, a patrolman then on duty, walked past the restaurant at about 12:55 o'clock on the early morning of Monday, March 17, 1952. As he did so he almost collided with an unknown man who came out of the door carrying a small cardboard box. Walsh looked into the restaurant window and saw defendant

and a woman standing there with their overcoats on. He positively identified defendant whom he had known as the proprietor and had seen off and on for several months in the restaurant; he did not identify the woman. Continuing on for a few blocks he heard fire engines and followed them back to the restaurant which he reached at about ten minutes or a quarter after one o'clock. It was then "a mass of flames—everything was aflame; flames were shooting out the side, flames were shooting a couple of stories high."

Captain Hassett was the commanding officer of an engine company which was called to the fire at 1:07 A.M. and arrived at the restaurant at 1:10 A.M. He testified that it took three other engine companies, two truck companies, and two battalion chiefs, with the use of 6 hose lines pouring 12,000 gallons of water on the fire during a period of twenty minutes merely to black out the visible flames, and it took a total of an hour and twelve minutes to finally put out the fire in these small premises. Hassett said that when he arrived the bulk plate glass window on the front had blown inward, the windows on the east wall had been broken out by the heat, "the entire inside of the restaurant was just one sea of flames" which "were shifting out those windows to a height of approximately 20 to 30 feet." The only food contained in the place was a little ice cream in a container in the refrigerator, a 6-ounce piece of bologna, and half a pound of spareribs.

After giving this testimony Hassett was questioned concerning his qualifications as an expert. It appeared that he had been in the fire department for 14½ years except for three years' service in charge of the Marine Corps Fire Department during the war. He had attended the Philadelphia Fire School, the Philadelphia Officers' Class, and the Fire School of the City of Wilmington, North Carolina; he had also taken three semi-

nars in arson investigations at Purdue University and one at New York University. He was then asked the question : Considering that there was no fire at the restaurant at five minutes of one, that the alarm came in at seven minutes after one, that he arrived at the fire at ten minutes after one, that he then found the conditions as he had described them—the sea of flames, the plate glass window collapsed, the side windows broken out, the flames licking up the side of the building 20 to 30 feet, the fact that 12,000 gallons of water were required by three companies to blacken the flame, the extent of the damage within the restaurant, the fact that he found a rolling mass of flame in the center of the restaurant although there were no objects burning there—what in his opinion was the origin of the fire? The question was objected to by counsel for defendant but allowed by the court. The witness answered that in his opinion the fire had been "accelerated; it was not the normal type of fire for that sort of occupancy" and was of incendiary origin; he gave in detail the reasons which led him to this conclusion. He admitted that there was no physical evidence present of any incendiary or explosive material but stated that any such material would have been completely consumed in the fire as he observed it without leaving any trace detectable by smell or otherwise.

Captain Gallagher, who had been on the force of the Fire Department of the City of Philadelphia for 39 years and was then an Assistant Fire Marshal in the Department, and whose function it was to investigate fires of undetermined origin, testified that he came to the restaurant at 8:30 o'clock on Monday morning, which was some seven hours after the commencement of the fire, and he carefully examined all the burned furniture and the various items of debris. He gave a graphic picture of the complete wreckage. He was

asked, as an investigator for the Fire Marshal's office and as a person of such long experience in fighting and investigating fires, what his opinion was as to the origin of this fire, taking into consideration his examination of the restaurant and the debris and, as he himself added, "the time element," that is to say, the few minutes in which the fire got under way. The question was objected to by counsel for defendant but was allowed by the court. Gallagher answered that in his opinion the fire was of incendiary origin, that "a fire of this type could not get such an acceleration without some other process besides what was in there, . . . some material that would activate that fire, . . . material or flammable liquids." This witness also testified that he had talked to defendant a few days after the fire and defendant had stated to him that there had been no inflammable goods on the premises that would create a fire, that the restaurant had been closed at three o'clock that Sunday morning, that they usually opened around four o'clock on Sunday afternoon but on this particular Sunday his wife was sick so he came there at about two-thirty or three o'clock in the afternoon and put a sign in the window stating he would not be there to open up at four o'clock; he claimed that the reason there was so little stock in the store was that the business had been good on Saturday night and also because he kept a lot of food in his home and took it back and forth to the restaurant as needed; he further told the witness that he had $6,000 of insurance on the contents of the restaurant.

Defendant presented no testimony, but relied on a request for a directed verdict. His motions for a new trial and for arrest of judgment were denied by the court.

In an arson case the corpus delicti consists of a willful and malicious burning, that is, a fire of incendiary

origin. That the corpus delicti can always be proved by circumstantial evidence is unquestionable.[1] As to whether the evidence in the present case was sufficient to establish the corpus delicti, little can be gleaned from other cases since each must depend upon its own facts. Here the circumstances all indicated that this was not an ordinary fire. It could not have commenced before five minutes of one, the alarm was given at seven minutes after one, and when Captain Hassett arrived on the scene at ten minutes after one the premises, although containing comparatively little equipment, were in an extraordinary state of blaze. It is not necessary to recite again the testimony of the witnesses in regard to the strange rapidity of the conflagration as well as all the other facts hereinbefore set forth. Two qualified experts testified that in their opinion the fire was of incendiary origin.

Defendant objected to the admission of this expert testimony on the ground that it purported to answer the ultimate question which it was the function of the jury to decide. This is an obvious misconception in that the ultimate question for the decision of the jury was not whether the fire was of incendiary origin but whether defendant was guilty of the perpetration of the crime. No reason is or can be advanced why the introduction of expert testimony in connection with the proof of the corpus delicti in arson cases should be governed by any different rules than those which apply in prosecutions for other crimes (see 4 Am. Jur. 108, §52). Thus, in murder cases for example, it is common practice to receive expert medical opinion to establish that the death

---

[1] *Commonwealth v. Sheffer*, 218 Pa. 437, 67 A. 761; *Commonwealth v. Gardner*, 282 Pa. 458, 464, 128 A. 87, 90; *Commonwealth v. Danarowicz*, 294 Pa. 190, 194, 144 A. 127, 128; *Commonwealth v. Lettrich*, 346 Pa. 497, 502, 503, 31 A. 2d 155, 158; *Commonwealth v. Smith*, 111 Pa. Superior Ct. 363, 366, 170 A. 331, 332.

of the victim was the result, not of natural causes, but of a criminal act, as, perhaps, that the deceased died of suffocation caused by strangulation, or as the result of bullet wounds in vital areas. Expert testimony is admissible in all cases, civil and criminal alike, when it involves explanations and inferences not within the range of ordinary training, knowledge, intelligence and experience. Certainly laymen could hardly be expected to have knowledge in regard to various types of fires and the difference in the nature, violence and intensity of flames resulting from the burning of inflammable liquids or other materials as contrasted with the burning of a wooden counter or hair upholstery, differences in the rapidity of such fires, sufficiency of the heat generated to cause the cave-in of a bulk window, the fact that where inflammable liquids are consumed or being burnt their presence cannot be detected by the sense of smell. Indeed, the very absence of any trace of inflammable liquids on the premises, which was one of the main points relied on by defendant, amply justified the introduction of expert testimony to establish that this did not overcome the significance of the other indications of the incendiary origin of the fire. In short, while in some arson cases the testimony may not need any supplementation by expert opinion, other such cases clearly justify its admission: 2 Wharton's Criminal Evidence (12th ed.), 341, §517. The present is such a case, and it may be added that Captain Hassett and Captain Gallagher were extraordinarily well qualified by their unusually long experience in fighting fires and investigating their causes. Of course the jury were not obliged to accept the opinion evidence of these witnesses and the learned trial judge so told the jury, affirming a point submitted by defendant that "It is the exclusive function of the jury to determine under all the evidence whether this fire was of incendiary origin. The jury

is not necessarily bound to believe the opinion of the fire marshal as to the cause of the fire in the absence of actual physical evidence of the incendiary origin of the fire."

This brings us to the question as to the proof of defendant's guilt. Such proof, like that of the corpus delicti, may also be established by circumstantial evidence,[2] especially in arson cases: *Commonwealth v. DePetro,* 350 Pa. 567, 577, 39 A. 2d 838, 842, 843; *Commonwealth v. Margie,* 165 Pa. Superior Ct. 84, 87, 68 A. 2d 194, 196. It was not necessary for the Commonwealth to produce direct evidence by an eye witness that defendant started the fire. He was the only person in immediate control of the premises; he was seen there in the wee hour of the morning when no object or duty of business could have called him there and within a very few minutes before the outbreak of the fire; customers had been warded off by the sign placed in the window; if, as the jury must have concluded, the fire was of incendiary origin, he alone could have had any interest in the occurrence. Of course it is possible that each and all of these circumstances might have been explained by defendant, but they were clearly sufficient to go to the jury on the question of his guilt. True, it does not appear that there was any over-insurance of the fixtures but the business apparently had not been a very profitable one, the lease still had over four years to run, and the conversion of the equipment into cash proceeds of the insurance policies might well have appeared desirable: cf. *Commonwealth v. Mowad,* 136 Pa. Superior Ct. 537, 545, 546, 7 A. 2d 596, 599. It is not necessary, however, to speculate as to a possible or even

[2] *Commonwealth v. Libonati,* 346 Pa. 504, 508, 31 A. 2d 95, 97; *Commonwealth v. DePetro,* 350 Pa. 567, 577, 39 A. 2d 838, 842; *Commonwealth v. Wentzel,* 360 Pa. 137, 143, 61 A. 2d 309, 312; *Commonwealth v Margie,* 165 Pa. Superior Ct. 84, 87, 88, 68 A. 2d 194, 196.

probable motive since it is elementary that, while motive may be an important factor, it is not incumbent on the Commonwealth, in order to make out a case, to prove the existence of any motive, much less of an adequate one: 14 Am. Jur. 786, §27. All that is required is that, the evidence being circumstantial, the circumstances proved should be such as reasonably and naturally to justify an inference of the guilt of the accused, and of such volume and quality as to overcome the presumption of innocence and satisfy the jury of the accused's guilt beyond a reasonable doubt: *Commonwealth v. Marino,* 142 Pa. Superior Ct. 327, 334, 16 A. 2d 314, 317; *Commonwealth v. Bausewine,* 354 Pa. 35, 41, 46 A. 2d 491, 493; *Commonwealth v. Carey,* 368 Pa. 157, 163, 164, 82 A. 2d 240, 242; *Commonwealth v. Kloiber,* 378 Pa. 412, 427, 106 A. 2d 820, 828. The evidence here, as the Superior Court properly held, adequately satisfied that requirement.

The judgment of the Superior Court is affirmed.

————

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

Richard J. Nasuti, the defendant in this case, and a Mr. Gallagher, who is a school teacher and athletic coach at the Southern High School in Philadelphia, owned a little restaurant (staffed by two waitresses) in the basement of the Hardt building at Columbia Avenue and Broad Street, Philadelphia. The restaurant measured about 30 feet in length and was some 16 feet wide. In the early morning of March 17, 1952, this restaurant was destroyed by fire. The description of that fire in the Majority's Opinion would do justice to a conflagration much more pretentious than the one which occurred in the modest basement of the Hardt building. The fact that the firemen poured 12,000 gal-

lons of water on the blaze (at the rate of 600 gallons per minute) testifies to the excellent work of the fire-fighters, but has nothing to do with whether the fire was or was not of incendiary origin, which is the only question before us on this appeal.

If the fire which destroyed this small eating place had a criminal inception, the defendant Nasuti was legally convicted; if it was of accidental origin, he has been illegally convicted. In this respect, I make the assertion that there is not one piece of substantive evidence in the whole one hundred printed pages of the record which points to incendiarism. The conclusion that Richard Nasuti set fire to his restaurant is sheer conjecture and guesswork, unworthy of the precise rationalization expected in a criminal case which has to do with a man's liberty. Only three witnesses testified for the Commonwealth: one police officer who stated he saw the defendant at the restaurant before the fire and two witnesses who testified that in their opinion the fire was of incendiary origin. Never in the past has this Court approved of expert testimony based on such evanescent and volatile shadows as were used as the basis for the expert opinions introduced in this case.

Captain Charles J. Hassett, who, with his engine company, responded to the fire alarm, testified that in his opinion the fire which consumed the premises was purposely kindled. This opinion was not built on any foundation of substance. He had no knowledge of the contents of the premises, he found at the place of the fire no material, ingredients, chemicals or fuel usually associated with incendiary fires. All he saw was flames. But flames have not been so scientifically analyzed and catalogued that one can tell with unfailing accuracy and infallible judgment, merely by noting their fleeting and erratic dancing in the air, what produced and feeds them. Beyond witnessing and fighting the fire,

all that Hassett knew of its history was that a police officer had testified that he had seen the building intact a few minutes before midnight, that at 1:07 a.m., a fire alarm sounded, and that firemen arrived at the blazing locale at 1:10 a.m. Once upon the scene, Hassett noted that the bulk plate glass window had collapsed and that the inside of the restaurant was a "sea of flames."

At this juncture I would like to point out an error which has persisted in this case from the beginning and apparently was undetected even by defense counsel. In its opinion refusing motions for arrest of judgment and new trial, the lower Court said: "Sgt. Walsh testified that as he passed the restaurant about 12:55 a.m., he saw defendant and an unidentified woman in the rear of the restaurant." All of the attorneys accepted 12:55 as the time that the officer looked into the restaurant. The Superior Court, in its Opinion affirming the conviction, said: "At 12:55 on the morning of March 17, 1952, Police Officer Walsh, in patrolling his beat, was on his way to change the controls on automatic traffic signals . . . As he passed the restaurant an unidentified man emerged from it and almost collided with him. The officer then observed the defendant and an unidentified woman in the rear of the dimly lighted room."

This Court, in its opinion affirming the Superior Court, says: "Sergeant Walsh, a patrolman then on duty, walked past the restaurant at about 12:55 o'clock on the early morning of Monday, March 17, 1952 . . ."

But Sergeant Walsh did not say he looked into the restaurant at 12:55. He looked in at 12:45. Here is his testimony: "On that particular morning about *quarter of one* I was patrolling my beat from 10th Street to Broad Street and looking into the windows on the south side of Columbia Avenue. As I came abreast of 1338 Columbia Avenue, this restaurant, a man walked

out of the door with a small carton about a foot square. He and I almost collided. I had to sidestep to avoid a collision. As I did, I looked into the window and I saw the owner and a woman standing there with overcoats on."* This difference in ten minutes is of all-vital significance. A fire which could have begun at 12:45 or an instant thereafter could reach much more violent and extensive proportions by 1:10 than one which began at 12:55. Ten minutes, so far as a fire is concerned, can be the difference between a blaze and a conflagration, between life and death, between partial and total destruction.

After Sergeant Walsh had testified to looking into the restaurant at 12:45 and continuing on his way, he said: "As I reached 10th Street I heard fire engines coming I got out in the street and directed them and followed them back in an automobile. When I got to where they were—Q. What time was it when you were passing the Carl-Rich Restaurant? A. I would say about five of one *by then.* I followed the fire engines out, and discovered this restaurant was a mass of flames." The phrase *"by then"* indicates quite clearly that the witness was referring to an event *subsequent* to the time that he had already looked into the restaurant. When he answered the District Attorney's question: "What time was it when you were passing the Carl-Rich Restaurant?" the officer obviously assumed that the District Attorney was asking him as to the time he appeared at the restaurant with the fire engines. The whole structure of the language makes this conclusion incontrovertible. However, Sergeant Walsh was mistaken when he said he arrived at the restaurant with the fire engines at "five of one". The fire alarm was not turned in until 1:07, and this fact, of course, is also

---

* Italics throughout, mine.

incontrovertible because the fire department has a record of the call. Thus, we come to the incontestable conclusion that Sergeant Walsh was in error as to the time he arrived at the restaurant with the fire engines. Accordingly, we come back to his original, unequivocal, categorical statement that when he looked into the restaurant, the time was 12:45. Another reason why we must take the 12:45 hour as the correct one is that in a criminal case all facts which may raise a reasonable doubt as to guilt are to be resolved in favor of the defendant

After the Commonwealth rested in this case, the defendant demurred under the provisions of the Act of June 5, 1937, P. L. 1703. In the case of *Commonwealth v. Marino,* 142 Pa. Superior Ct. 327, 330, the Superior Court, in interpreting that Act, said: "The enactment of the Act of 1937, supra, took away from the effect of the demurrer to the evidence any admission by the defendant of the facts in evidence and of the inferences reasonably deducible therefrom, except for the purpose of deciding upon the demurrer, and limited its practical effect to something very similar to a motion for a nonsuit in a civil action . . ."

Since, in considering the evidence before us we are constrained to read it in the light most favorable to the accused, we are bound to accept Sergeant Walsh's statement that he looked into the restaurant at 12:45 as established fact.

It is taken for granted that when Walsh glanced into the darkened restaurant at 12:45 he saw no fire although he did not make any investigation of the premises. It is consistent with the facts as presented at the trial that the fire could have been smoldering even long before 12:45, only to burst forth into full flame later. But, even assuming that the fire began at 12:45, and the defendant is entitled to the best inferences which

can be drawn from the evidence, it is obvious that in 25 minutes a fire in a restaurant, with its comestibles, wooden furniture, paper plates, paraffin cups and other combustibles could easily develop into a "sea of flames" without the acceleration of incendiary fuels.

That the firemen found in the refrigerator only some ice cream, bologna and spareribs seems to give the Majority much food for thought, but a fire, which could convert the interior of a restaurant into a "sea of flames" would naturally lick up any other food not refuged in fireproof containers.

There could never have been a conviction in this case without the so-called expert testimony presented by Captains Hassett and Gallagher of the Fire Department because, lacking their stated opinions on the origin of the fire, the evidence simply spelled out a fire without criminal inferences or connotations of any kind. After Captain Hassett had testified as to what he had seen when he arrived at the fire at 1:10 a.m., the District Attorney put to him a hypothetical question which the Majority has summarized as follows: "Considering that there was no fire at the restaurant at five minutes of one, that the alarm came in at seven minutes after one, that he arrived at the fire at ten minutes after one, that he then found the conditions as he had described them—the sea of flames, the plate glass window collapsed, the side windows broken out, the flames licking up the side of the building 20 to 30 feet, the fact that 12,000 gallons of water were required by three companies to blacken the flame, the extent of the damage within the restaurant, the fact that he found a rolling mass of flame in the center of the restaurant although there were no objects burning there—what in his opinion was the origin of the fire?"

The major and completely crippling item in this hypothetical question is the incorrect statement that

"there was no fire at the restaurant at five minutes of one." There was absolutely no testimony that the restaurant was not on fire at 12:55. We have seen that the only witness who testified on this subject declared that he looked into the restaurant at 12:45, and even then he did not say that there was no fire burning. There could well have been a latent fire in process at that time which came to the surface after he passed by.

Hassett did not testify, as stated in the hypothetical question, that the restaurant was a "sea of flames." He said that the *inside* of the restaurant was a sea of flames. It would not take much of a fire inside this matchbox of a restaurant to create a miniature "sea of flames." In point of fact, Hassett specifically denied that the restaurant itself was enveloped in flames. He even testified that he could go into the restaurant for ten feet before encountering any flames. His testimony in this respect speaks for itself: "Q. You said the flame was all in the back—there was a mass of flames in the back. You went in for ten feet? A. I did not say that: I said the flames were on the side. Q. You did go into that store for a space of ten feet? A. Approximately. Q. There was no fire there? A. No, sir. Q. The whole place was not a mass of flames? A. *I didn't testify the whole place was a mass of flames.* Q. You had ten feet that you could get into? A. That most certainly was not a mass of flames."

Nor was it correct to state in the hypothetical question that "there were no objects burning in the 'center of the restaurant.'" The evidence shows that there were many objects in the center of the restaurant which was food for the devouring flames. Those objects included wooden counters, stool seats, upholstered booths, acoustic tiles, asphalt pavement, cigarette-dispensing, juke

box, pinball, weighing and slicing machines, paper dishes and cups.

Even if there had not been inserted into the hypothetical question the serious errors of fact which I have indicated (and which in themselves would be enough to make the question incompetent), the hypothetical question was entirely out of order because it did not call for an opinion which the jurors could not have formed for themselves. If there had been discovered on the premises some device, materials, or chemicals, the working of which did not fall into the realm of general knowledge, an expert's opinion might have been acceptable to help the jury in determining whether the fire was or was not of incendiary origin. That, however, was not the case here.

The weight of authority throughout the nation is against the allowance of expert testimony based on evidence which is non-technical and is as easily assimilable by a lay mind as a professional's mind. In *People v. Grutz*, 212 N.Y. 72, the Court of Appeals of New York said: "An assistant fire marshal of the City should not be permitted to express his opinion as to the origin of the fire, *where the physical facts are so simple that they can be readily understood by the jury when properly presented.*"

In the case of *Beneks v. State*, 196 N.E. 73, the Supreme Court of Indiana said: "It would seem, however, that in the case of the origin of a fire, if the expert is permitted to testify to the primary facts, *the conclusions can be drawn by the jury,* and hence the expert should not be permitted to give his opinion upon the ultimate fact. This view is sustained by all of the authories which have come to our attention."

In *Carter v. State*, 4 Ohio App. 193, the Ohio Court of Appeals said: "The theory of the state throughout the trial was that Carter had arranged combustible ma-

terial in the basement or cellar and had started a slow fire some hours before the fire broke out and the alarm was given. The effort of the state was to prove to the jury this fact. It did not involve any question of science or art and does not, as we believe, fall under any of the exceptions to the rule admitting expert testimony only in cases where questions scientific or artistic in their nature are involved.

"Of course this error was prejudicial to the plaintiff in error. His right to have his guilt or innocence passed upon by a jury is guaranteed to him by the constitution, and we think the evidence erroneously admitted deprived him of this right and that the court, by admitting this evidence, gave the jury to understand that the conclusions reached by these witnesses were binding on them, or at least such inferences would naturally be drawn by the jury from the action of the court in admitting such evidence against the strenuous objection of counsel representing Carter."

In 2 Wharton, Criminal Evidence, 12th Ed., Sec. 517, we find: "In an arson case, a witness cannot, as a general rule, testify concerning his opinion as to whether the fire was or was not of incendiary origin, that being a question for the jury to determine, and upon which they can usually form their own opinion without any need of expert advice."

In *State v. Cuthrell*, 233 N.C. 274, the Supreme Court of North Carolina said: "The corpus delicti in such prosecution consists of two elements: the fire, and the cause of the fire. Annotation: 13 Ann. Cas. 803-804. The fire must be incendiary in origin. S. v. Church, 202 N.C. 692, 163 S.E. 874. The statement of Sheriff Stevens, who visited the premises subsequent to the fire, that in his opinion the building was 'set afire' is clearly incompetent. *This is not a case for opinion evidence. The physical facts, which are the subject of*

*the investigation, are so simple that they can be readily understood by the jury when properly described by the witness, and the jury is as well qualified as the witness to draw the appropriate inference from them."*

These quotations are only a sample of the expressions contained in textbooks and in reports of the appellate courts throughout the United States. This is the first time that the precise question before us has come to this Court. Why should we take a position so contrary to that expressed throughout the Nation? Why should we create a precedent which will come back to vexatiously haunt this Court and all other Courts in the Commonwealth in other cases?

Taking up again the testimony of Commonwealth witness Captain Hassett, it is interesting and significant to note that he had no desire to answer the hypothetical question put to him. It is apparent that at first he realized that his answer to the question could only be a valueless surmise. Accordingly when the District Attorney asked him: "Can you tell what was the origin of the fire?" he answered: "I don't know." When he was asked if the fire was of incendiary origin he still declined to answer in the affirmative. The most he would say was that "The fire had been accelerated." When, finally, the District Attorney almost put the words into his mouth, he answered that in his opinion the fire was of incendiary origin. This, in spite of the fact that he had testified that he didn't see anything that was incendiary, he didn't smell anything that was incendiary, and he didn't find any remnants of anything that could have been incendiary.

The Trial Court then permitted another highly improper question: "Q. Now, Captain, from your academic training and your work in the Fire Department, can you name for us incendiary agents that consume themselves and leave no trace?" This question suggested to

the jury that the defendant had used incendiary agents which the fire had consumed. The witness then proceeded to name these agents as follows: ". . . Some of the most common would be gasoline, naptha, benzine, acetone, alcohol, and to some extent nitrocellous products of certain types " What protection can a defendant have in an arson case if the District Attorney is allowed to tell the jury that the only reason he cannot produce damning evidence against the accused is that the fire destroyed it. The jury might just as well be told in a situation of this kind that the defendant had left in the building a note in which he confessed to starting the fire but that the note was consumed in the fire!

The expert testimony offered by the witness Charles A. Gallagher was even more objectionable than that presented by the witness Hassett. Gallagher did not arrive at the scene of the fire until seven hours after it was extinguished. The hypothetical question put to him was as follows: "Captain, in your opinion, considering your examination of the debris, your examination of the restaurant, also the construction of this building, plus the layout of the restaurant, also the examination of the debris; considering your examination of Mr. Nasuti and his statements to you regarding the absence of inflammable materials in the restaurant, and also considering this was a restaurant, in your opinion what was the cause of the fire?" Captain Gallagher replied that "it was an incendiary fire." However, in giving his answer he put into the question vital elements which were *not* in the case. Under cross-examination, he admitted this appalling fact: "Q. What other facts did you take into consideration— what other facts did you put into that question before you answered it? A. . . . I figured it out that a fire of this type could not get such an acceleration without some other process besides what was in there. Q. What do you mean by 'some other proc-

ess'? A. Some material that would activate that fire. Q. So you put some material into the case? A. *Material or flamable liquids.* Q. Did you find any evidence of flamable liquid? A. *No, sir.* Q. Then, you didn't answer that hypothetical question, did you? A. I might say that I did, in my way."

The witness thus brazenly declared that he assumed that there were on the premises "material or flamable liquids" in the face of the stark reality that he found no such material, and in spite of the fact that no other witness said that any such material was on the premises.

The fact that Captain Hassett and Captain Gallagher are veteran firemen with superb training, qualifications, and experience as fire-fighters does not improve to any degree the quality of their testimony which is based on the sheerest speculation. In fact, the impressiveness of their qualifications as fire-fighters only adds to the gravity of the error in permitting them to give opinion testimony because it led the jury to believe that the hypothetical question put to the witnesses was an intricate and technical one which could only be answered by persons of superior education and intelligence and that, therefore, they, the jury, should take the answers of these witnesses as conclusive. This, in effect, robbed the defendant of a constitutional trial by jury.

The Commonwealth proved no motive for the alleged crime. The insurance coverage on the restaurant was only $6,000, which no one claims amounted to over-insurance. Nor was there evidence of financial embarrassment on the part of the defendant which might have suggested the collection of insurance money as a means of obtaining desperately needed cash. It seems to me a rather serious matter to permit a conviction of arson to stand when there is no evidence that the defendant

had anything to benefit from a fire which, it is not proved, except on the wildest guess, was arsonious in character. The Majority says in its opinion that "if, as the jury must have concluded, the fire was of incendiary origin, he [Nasuti] alone could have had any interest in the occurrence." The record does not justify so categorical an utterance. There could have been many persons unknown to us who "could have had an interest" in the happening of a fire. For one, although I do not mean to suggest in any way that he had any connection with the fire, Mr. Galleta, who was Nasuti's partner, could have as much an interest in the occurrence of the fire as that interest which the Majority ascribes to Nasuti.

The Judge who presided over this case is one of the truly great trial jurists of our day, and I have for him unstinted admiration and respect. I regret, therefore, that in the conscientious discharge of my duty as an appellate judge, I must differ with his views in this case. In refusing the motion for arrest of judgment and for a new trial on the ground of improper admission of opinion testimony, he said : "This case might be denominated a classic illustration of necessity permitting otherwise inadmissible opinion testimony to be presented to the jury." With all diffidence I put the question : But if the testimony is inadmissible, on what basis does necessity make it admissible? And where is the necessity? Is it necessary for the Commonwealth to convict only because there are suspicious circumstances which make it possible that the defendant *might* be guilty? Are we drifting from the respected and revered rule in America that it is more in conformity with our ideals of justice that a guilty man should escape punishment than that an innocent man should be convicted?

I do not know whether Nasuti is guilty or not. I do know, however, that he has not been adjudicated

guilty in accordance with the principles of law which have illuminated the pages of American justice since we severed all allegiance to the harsh rules of the criminal law of England. That there is considerable doubt as to the defendant's guilt is dramatically demonstrated in the fact that three juries have already sat on this case. The first jury could not agree and was discharged. The second jury found the defendant guilty but the Trial Court was dissatisfied and ordered a new trial. The third jury convicted but it was in a measure coerced into its conclusions by the improper expert testimony which could only derail their independent thought and overwhelm their untrammeled judgment.

Our courts have always thrown a mantle of protection around defendants who are accused by circumstance rather than by direct witnesses. In the case of *Commonwealth v. Byers,* 45 Pa. Superior Ct. 37, 38, the Superior Court said: "When a crime charged is sought to be sustained *wholly* by circumstantial evidence, the hypothesis of guilt or delinquency should flow naturally from the facts and circumstances proved, and be consistent with them all. The evidence of facts and circumstances must be such as to exclude to a moral certainty, every hypothesis but that of guilt of the offense imputed, or in other words the facts and circumstances must not only be consistent with and point to the guilt of the accused, but they must be inconsistent with his innocence." This rule has been followed by many decisions of the Superior Court and the Supreme Court. In *Commonwealth v. Marino,* 142 Pa. Superior Ct. 327, 334, President Judge KELLER suggested a modification of the rule as follows: "When a crime charged is sought to be sustained wholly by circumstantial evidence the circumstances proved should be such as reasonably and naturally to justify an inference of the guilt of the accused, and should be of such volume and quality as to

overcome the presumption of innocence and satisfy the jury of the accused's guilt beyond a reasonable doubt." Accepting Judge KELLER's modification of the circumstantial evidence rule as to standard of proof, it is clear that Nasuti has not been proved guilty. Where is the volume and quality of evidence in this case which overwhelms the presumption of innocence? As against the possibility that Nasuti set fire to his premises there are numerous possibilities that he did not. It is entirely consistent with the evidence that the fire began in one of a number of innocent ways. Among the possibilities which quickly suggest themselves are: a leaking gas pipe, a smoldering cigarette butt, spilled lighter's fluid, a short circuit, an unextinguished stove, a hot grill, spontaneous combustion.*

The decision filed today lays down a precedent which I predict will do considerable damage to the cause of criminal justice in the courts of our Commonwealth. The allowance of expert opinions in a field which in the past was occupied only by the jury will play havoc with the regularity of criminal procedure and may well be productive of grave miscarriages of justice. The Majority here is affirming a conviction on evidence which should have no standing in our Courts.

It is manifest from the opinion of the Majority that it has concluded the defendant is guilty of the offense charged against him. It would appear, therefore, that it is permitting the spanning of a heretofore unbridgeable chasm of inadmissible testimony simply because of that belief in the defendant's guilt. But in this respect I would like to offer the observation that a bridge which is specially constructed to carry a presumed guilty man

---

* A somewhat unusual case of spontaneous combustion occurred in 1916, when an explosion in a flour mill was found to be due to accidental spark ignition of an intimate mixture of flour dust and air.—Encyclopedia Americana, Volume 7, page 353.

460

to a merited punishment will remain some day to carry an innocent man to an unjust doom.