J-S38008-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| YOLANDA WATERS | : | |
| | : | |
| Appellant | : | No. 272 EDA 2025 |

Appeal from the Judgment of Sentence Entered December 4, 2024
In the Court of Common Pleas of Delaware County Criminal Division at
No(s): CP-23-CR-0001657-2024

BEFORE: McLAUGHLIN, J., KING, J., and BENDER, P.J.E.

MEMORANDUM BY McLAUGHLIN, J.: **FILED FEBRUARY 23, 2026**

Yolanda Waters appeals from the judgment of sentence entered on her conviction for theft by unlawful taking or disposition.[1] She challenges the sufficiency of the evidence, the admission of evidence, the grading of her conviction, and the court's discretion in limiting her argument to the jury. We agree the evidence was insufficient. We therefore reverse Waters's conviction and vacate the judgment of sentence.

Waters's conviction stems from the disappearance of a customer's wallet at a ShopRite grocery store where Waters worked. The evidence presented at trial, viewed in the light most favorable to the Commonwealth, was as follows.

The wallet's owner, Marjorie Houser, testified that she visited the ShopRite on March 11, 2023. N.T., Volume II, 12/3/24, at 134-135. About an

_____

[1] 18 Pa.C.S.A. § 3921(a).

hour after leaving the store, Houser received a voicemail from ShopRite employee, Theresa Mattison, who said her wallet had been found and that she could pick it up the next morning. *Id.* at 135, 140. Houser testified she had $811 in her wallet in gift cards and cash, as well as credit cards. *Id.* at 137. Houser arrived at the ShopRite the next morning to retrieve her wallet, but employees could not find it. *Id.* at 135-136.

Mattison testified that while working at ShopRite on the day in question, someone turned in a wallet to customer service. *Id.* at 143. She explained that she opened the wallet to see if there was an identification card ("ID")*. Id.* Mattison found an ID and searched social media to find the person who matched it. *Id.* She called the owner on Facebook and left a message explaining "who I was, where I worked, and that I, we found the wallet," and to give her a call. *Id.* Before leaving work, Mattison told Waters, who was the evening bookkeeper, "that there was a wallet and I contacted the lady but she hadn't called me back yet," and that the wallet was on a shelf where they kept lost and found items. *Id.* at 143, 144, 145, 146. The customer contacted Mattison later that night and said she would pick up the wallet the next day. *Id.* at 143-144. Mattison arrived at ShopRite the next day, saw the customer, and went to retrieve the wallet, but it was missing. *Id.* at 144. Mattison testified that on the night in question, another employee was working customer service during the night shift, but she did not remember his name. *Id.* at 148.

The ShopRite store director, Jeffrey Beaky, testified that there is no policy regarding lost items at the store but that any lost items are placed in customer service, above the desk. N.T., Trial, 12/4/24, at 4-5. The day after the wallet was found, Beaky spoke with Houser, who told him that she had lost her wallet the day before and that it was not there when she came to pick it up. *Id.* at 8. He then went to review the surveillance cameras and explained what he viewed as follows:

> After we watched the camera, we noticed that the customer service girl who worked the night before went through the purse,[2] took the purse from the top of the customer service and it disappeared. So, obviously she took the purse. So we watched an hour before, we watched a couple hours after the video to make sure it never came back.

*Id.* He identified the individual in the video removing the wallet from the cubby area as Waters, and that her responsibilities in bookkeeping included handling the lost and found. *Id.* at 9, 21, 22. He stated that the video showed her putting the wallet on top of a safe and later putting it in a bag. *Id.* at 15, 17. Beaky testified that he checked the bag and the area where he observed Waters place the wallet but did not find it. *Id.* at 17. He also testified that no one else entered or left the bookkeeping room besides Waters. *Id.* at 18.

Beaky called Waters to ask about the wallet, and Waters told him, "It was put back where it was." *Id.* at 9, 10. He then spoke with her a second time, in person, and she stated that "she just kept an eye on [the wallet] so

_____

[2] Beaky referred to the wallet as a "purse" throughout his testimony. However, a review of the record shows that he was referring to the wallet.

that she put it back where it was." *Id.* at 10. He then scheduled another meeting with Waters and the loss prevention director. Waters did not come to that meeting. *Id.*

Beaky conceded that the video did not show Waters leaving the store with a bag containing a wallet or footage of the wallet being moved from the bag. *Id.* at 26-28. He also agreed that the video did not show her leaving with the wallet and that there is no footage of Waters returning to get the bag. *Id.* at 27. Beaky admitted that "multiple people" had access to that area, including himself, customer service employees, and "people who work in the cash room." *Id.* at 29. He explained that there were also two night managers who had access to the area that night. *Id.* at 30. When asked whether he needed to view the remainder of the video to see if the bag moved, Beaky said, "We saw what we saw. What we needed." *Id.* at 33.

The Commonwealth presented three surveillance videos from the ShopRite. Each video was time-stamped with the date March 11, 2023, and in military time.[3] The first surveillance video shows the customer service area. *See* Commonwealth Exhibit 1. It begins at approximately 7:18 p.m. and ends at approximately 7:19 p.m. It depicts a woman, whom Beaky identified as Waters, taking a wallet from a cubby area, exiting what Beaky said was the service area and walking to what he identified as the bookkeeping area, which is connected to the customer service area. *See* N.T., 12/4/24, at 14-15.

_____

[3] For clarity purposes, we reference the standard time.

The next video is of the bookkeeping area. ***See*** Commonwealth Exhibit 2. It begins at approximately 7:46 p.m. and ends at approximately 7:47 p.m. The video depicts a door from the bookkeeping area to the rest of the store, as well as access between the bookkeeping area and the customer service area. Beaky testified that the door is the only way from the bookkeeping area to the store and only "cash room employees and customer service employees" have access to the bookkeeping area. N.T., 12/4/24, at 15. In the video, Waters opens the wallet, looks through it, and closes it. She then places it on a safe. Waters leaves the bookkeeping area through the door, and the video ends.

The final video also shows the bookkeeping area. ***See*** Commonwealth Exhibit 3. The video begins at approximately 8:18 p.m. and ends at approximately 8:40 p.m. Beaky identified Waters as the woman shown in this video entering the bookkeeping area at approximately 8:25 p.m. At the time, the wallet was still on top of the safe. At approximately 8:26 p.m., Waters walks over into the customer service area and remains there. At approximately 8:28 p.m., Waters takes the trash from the customer service area, walks through the bookkeeping area, and out the door to the store. At approximately 8:30 p.m., Waters reenters through the door, takes the wallet from the top of the safe, and steps out of the video frame. She then reappears and places the wallet inside a bag to the left of the safe. At approximately 8:31 p.m., Waters leaves the bookkeeping area through the door, without picking up the bag or the wallet, and does not appear on screen again for the

remainder of the video. At approximately 8:36 p.m., a woman enters the bookkeeping area from the customer service area and goes in the area of the store. She then returns through the door from the store and walks back to the customer service area.

Corrine Dyer testified that she worked as a bookkeeper at ShopRite from October 2019 until June 2024. N.T., 12/4/24, at 44. Dyer testified that she no longer worked for ShopRite after being terminated for missing money. *Id.* at 54. She testified that part of her responsibilities as a bookkeeper would have been to deal with lost and found property. If a wallet had been turned in, she would "see if they have any form of identification or like a ShopRite card." *Id.* at 46. She also explained that if there was a large sum of money in the wallet, it would have been given to the bookkeeper to place inside the safe. Dyer reviewed the one-minute surveillance footage of the bookkeeping area and pointed out the safe she would have used if a wallet had valuables in it. *Id.* at 48; Commonwealth Exhibit 2. She also explained that the area where Waters placed the wallet inside the plastic bag is where a filing cabinet, a coin sorter, and people's personal belongings are located. N.T., 12/4/24, at 58. She stated that "[a] lot" of employees placed their personal belongings in that section. *Id.* at 60. She also stated that she knew Waters to be a law-abiding person. *Id.* at 49.

Waters testified that on March 11, 2023, she worked as a bookkeeper at ShopRite from 3:00 p.m. until about 12:15 a.m. *Id.* at 68-69. She explained that she initially grabbed the wallet from the cubby area in the

customer service area because another employee told her "that she had a phone call from a young lady that she couldn't find her wallet. She wasn't sure if she left it in the store or if she lost it outside of the store." *Id.* at 70. She looked through the wallet to find "an ID or a ShopRite card or anything with a name on it" but did not find anything. *Id.* at 73. She said that she picked up the wallet from the top of the safe because she "was supposed to be putting it back" but got lightheaded and sat down. *Id.* at 76. She explained that she did not know why she placed the wallet inside the plastic bag, it was "an absent-minded thing," but she remembered that at the time, the customer service employee asked for her help. *Id.* at 77. She testified that she did not take the bag containing the wallet. *Id.* at 69-70.

Waters testified that the following day, the head bookkeeper called her about the wallet, and she told her that it was in the bag by the coin sorter. *Id.* at 78-79. She then received a call from Beaky, who said that they could not find the wallet. *Id.* at 79. She met with Beaky and his assistant, who explained they had watched the surveillance video. *Id.* at 80-81. She told Beaky "to do their investigation and when they clear my name to give me a call[.]" *Id.* at 81. She said that Beaky told her that he would get in touch with the head of loss prevention, and that they would reach out to her. *Id.* She testified that the head of loss prevention never reached out to her, but the following day Beaky asked her to come in. She testified that it was on a Tuesday, which was her day off, and that she did not come in for medical

reasons. *Id.* at 82. Waters said that she never returned to work after March 11 because of a medical emergency. *Id.* at 98.

The jury found Waters guilty of theft by unlawful taking or disposition. The court sentenced Waters to four years of reporting probation and ordered $811 in restitution. Waters filed a post-sentence motion, which the trial court denied. This timely appeal followed.

Waters raises the following questions:

I)     Whether the trial evidence is insufficient to sustain the theft by unlawful taking (count one) conviction since the prosecution failed to prove beyond a reasonable doubt that Ms. Waters unlawfully took or exercised unlawful control over the movable property at issue, let alone that she harbored intent to deprive the owner?

II)    Whether the conviction for theft graded as a first-degree misdemeanor must be vacated, as the prosecution failed to establish the misplaced wallet's value when Ms. Waters first handled it in the course of her job duties, and the jury made no findings regarding its worth?

III)   Whether the trial court erred when it prohibited Ms. Waters from arguing that video of the alleged incident was "missing," where the grocery store and police failed to take necessary steps to preserve all relevant recordings from the dates in question?

IV)    Whether the trial court erred when it permitted the prosecution, over Ms. Waters'[s] objection, to elicit testimony that a defense witness left her job following allegations of missing money, because a witness' character for truthfulness may not be attacked with specific instances of conduct?

Waters's Br. at 6 (issues rearranged for purposes of disposition).

Waters argues that the Commonwealth failed to present sufficient evidence to sustain the conviction for theft by unlawful taking. Waters claims that the jury's verdict is based on speculation and that the video evidence establishes that the evidence was insufficient. She argues that "[t]here is no evidence that she ever removed a customer's misplaced wallet from the establishment or intended to deprive the owner." *Id.* at 21. She points out that after she placed the wallet in the bag, the wallet "remained in that exact same location through the surveillance video's entire duration, and other people accessed the room." *Id.* at 23. Waters maintains that because "several people had access to the wallet, the conviction cannot stand." *Id.* at 24. She further maintains that because of this access, "[t]he evidence at trial is at least equally consistent with Ms. Waters'[s] innocence." *Id.*

The Commonwealth maintains that it proved every element. The Commonwealth asserts that the wallet was Houser's moveable property and the videos show Waters picking it up from above the customer service desk, going through it, and leaving it in another location. Com.'s Br. at 15. The Commonwealth stresses that the videos depict her later putting it into a bag "away from the location where lost and found items are typically stored," in an area "described by [Waters's] own witness as a place where employees place personal belongings." *Id.* The Commonwealth maintains that this same evidence establishes Waters's intent to deprive the owner of the wallet. *Id.* It contends that her failure to attend the meeting with the loss prevention manager is circumstantial evidence of consciousness of guilt. *Id.* at 15-16.

Our standard of review when considering a challenge to the sufficiency of the evidence is settled:

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence.

***Commonwealth v. Quel***, 27 A.3d 1033, 1037–38 (Pa.Super. 2011) (citation omitted). In assessing the sufficiency of the evidence, we examine the entire trial record and consider all evidence received. ***Id.*** at 1038. The trier of fact is free to believe all, part or none of the evidence. ***Id.*** The Commonwealth may sustain its burden of proving every element of a crime beyond a reasonable doubt with purely circumstantial evidence. ***Id.*** at 1037-38.

Nevertheless, if "the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances," the Commonwealth has failed to present sufficient evidence capable of proving guilt beyond a reasonable doubt. ***Id.*** at 1037. "The reasonable inference of guilt must be based on facts and conditions proved; it cannot rest solely on suspicion or surmise. These do not take the place of testimony." ***Commonwealth v. Bausewine***, 46 A.2d 491, 493 (Pa. 1946). Furthermore,

> if the trial evidence of record viewed in the light most favorable to the Commonwealth and all reasonable

- 10 -

inferences drawn from that evidence is only, at most, equally consistent with a defendant's innocence as it is with his guilt, the Commonwealth has not sustained its burden of proving the defendant's guilt beyond a reasonable doubt.

*In Int. of J.B.*, 189 A.3d 390, 415 (Pa. 2018). In other words, "[a]lthough the Commonwealth does not have to establish guilt to a mathematical certainty, and may in the proper case rely wholly on circumstantial evidence, the conviction must be based on more than mere suspicion or conjecture." *Commonwealth v. Hargrave*, 745 A.2d 20, 22 (Pa.Super. 2000) (citation omitted).

The crime of theft by unlawful taking or disposition occurs when a person "unlawfully takes, or exercises unlawful control over, movable property of another with intent to deprive [the other] thereof." 18 Pa.C.S.A. § 3921(a). Theft by unlawful taking requires a *mens rea* of the "intention or conscious object . . . to take unlawfully the property of another for the purpose of depriving the other of [the] property." *Commonwealth v. Dombrauskas*, 418 A.2d 493, 496 (Pa.Super. 1980) (*quoted in Commonwealth v. Peck*, No. 1128 WDA 2023, 2025 WL 1733948, at *7 (Pa.Super. June 23, 2025) (unpublished mem.)). The *actus reus* is satisfied by proof that the defendant "exercise[d] unlawful control over moveable property of another[.]" *Commonwealth v. Adams*, 388 A.2d 1046, 1047 (Pa. 1978) (finding

evidence sufficient where it showed defendant exercised unlawful control over a stolen automobile, but not that defendant originally took automobile).[4]

The evidence at trial did not establish the *actus reus*. It showed that Waters removed the victim's wallet from the customer service area, looked through it, and ultimately placed it in a bag. However, whether Waters removed the wallet from the bag or took the bag from the bookkeeping area remains speculation, as the Commonwealth's video ends with Waters leaving the bookkeeping area without either the bag or the wallet. Although Beaky said that he reviewed a portion of the surveillance footage from that night, he did not testify that he observed any footage of Waters removing the wallet from the bag, secreting it on her person, removing the bag from the bookkeeping area, or leaving with the wallet. He did not testify about the contents of the remaining video at all, and it was not played for the jury or entered into evidence. The uncontradicted testimony was that Waters's job duties included the handling of lost and found items and that there was no protocol for dealing with lost and found items. Waters's mere handling of the wallet was therefore not enough to establish unlawful control over it. Beaky also testified that only Waters entered the bookkeeping area that night. However, the available video shows a customer service employee entering and exiting the area.

_____

[4] **See also Commonwealth v. James**, Nos. 1969, 1970, 1971 EDA 2020, 2021 WL 6069608, at *5 (Pa.Super. filed Dec. 23,2021) (unpublished mem.) (citing **Adams**).

Even viewing the evidence in the light most favorable to the Commonwealth and making all reasonable inferences in its favor, we conclude that the evidence is insufficient. There is no evidence of what happened to the bag or wallet after Waters put the wallet in the bag. The evidence was too incomplete and inconclusive to prove guilt beyond a reasonable doubt. *See In re B.S.*, 831 A.2d 151, 156 (Pa.Super. 2003) (reversing adjudication of delinquency for theft by unlawful taking because evidence did not show that the juvenile unlawfully took the victim's property). We therefore reverse Waters's conviction and vacate the judgment of sentence. Given our disposition of this issue, we do not address Waters's remaining issues.

Conviction reversed. Judgment of sentence vacated.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 2/23/2026