## Commonwealth *v*. Pinckney, Appellant.

Argued December 12, 1960. Before GUNTHER, WRIGHT, WOODSIDE, ERVIN, WATKINS, and MONTGOMERY, JJ. (RHODES, P. J., absent).

*A. Benjamin Johnson, Jr.,* for appellant.

*William H. Wolf, Jr.,* Assistant District Attorney, with him *Thomas M. Reed* and *Arlen Specter,* Assistant District Attorneys, *Paul M. Chalfin,* First Assistant District Attorney, and *Victor H. Blanc,* District Attorney, for Commonwealth, appellee.

OPINION BY ERVIN, J., March 22, 1961:

Appellant, Irin Pinckney, also known as Irvin Pinckney, was indicted, together with one Andrew Grantz, and charged with unlawful possession of drugs, in violation of §4 of the Act of July 11, 1917, P. L. 758, as amended, 35 PS §854, which provides: "No person shall have in his possession or under his control, or deal in, dispense, sell, deliver, distribute, prescribe, traffic in, or give away, any of said drugs [opium or derivative of opium]." Grantz' case, which is not involved in this appeal, was disposed of separately immediately prior to appellant Pinckney's trial. Grantz pleaded guilty. Appellant Pinckney, having waived trial

by jury, then went to trial before President Judge JO-
SEPH SLOANE of the court below.

The facts are as follows: In the morning of Octo-
ber 8, 1959, about 9:05 a.m., a detective entered Grantz'
residence at 1218 South 16th Street, Philadelphia;
Grantz and appellant were found in a room in the rear
of the second floor; the detective found on the ground
in Grantz' yard outside the window of this room 15
paper packages, each containing 0.6 grains of a mixture
of heroin hydrochloride, quinine hydrochloride and re-
ducing sugar; chemical analysis subsequently showed
the concentration of heroin hydrochloride to be greater
than one-quarter grain per ounce; also found and con-
fiscated at the scene were a hypodermic needle con-
taining a residue of heroin and quinine, an eye dropper,
a metal bottle cap with a piece of absorbent cotton, and
a bottle labeled "Ravitol," which contained 37 Ravitol
jelly caps. Both suspects were taken to the Narcotic
Unit headquarters for questioning; Grantz was the
first to speak; he accused Pinckney of bringing "a pack-
age" and the hypodermic needle and the eye dropper
to his house and offering him a "taste" of the narcotic
drugs; Grantz stated that when he refused the offer
Pinckney then said he was going "to have a fix." It
was at that point, Grantz recalled, the detectives came
into the room. Grantz signed a transcript of his oral
statement and, when instructed by the detectives, read
it aloud to Pinckney, who remained silent. Officer
William Kelly testified that he entered the headquar-
ters as Pinckney came out of the room where Grantz
had just read the accusation. Pinckney told Kelly that
Grantz had signed a statement accusing him, that he,
Pinckney, was going to make a statement too. He then
said, "We are both in this thing together. Why is he
trying to dump all the blame on me?" About an hour
after Grantz gave his statement, Pinckney made and
signed a statement. He said that on the day before,

Grantz had promised him some drugs; early that morning he went to Grantz' home and then went to a room on the second floor to get part of the drugs promised him the day before; when Grantz had just finished "bagging" the drugs, the officers were seen entering the house so Grantz threw the then packaged drugs out of the window.

At the trial Pinckney contradicted his earlier account given to the police. He told Judge SLOANE that he had gone to Grantz' home to inquire about a job; he stated that he did not know that the narcotics were at the house prior to his arrival, nor did he bring any narcotics or narcotic-user implements to the house; he further swore that he never made a statement to Officer Kelly in which he admitted being in any way involved with Grantz in regard to the drugs. The trial judge found Pinckney guilty not only on the bill charging unlawful possession of drugs but also on a conspiracy charge. After dismissing motions for new trial and in arrest of judgment, the court below sentenced Pinckney on the unlawful possession charge and suspended sentence on the conspiracy charge. Pinckney then appealed.

The appellant's principal contention is that the Commonwealth's evidence is insufficient to find him guilty on a possession charge since the arrests were made in Grantz' house and the drugs were found in the yard below a window of the house and not in the physical possession of the appellant. We repeat what was said recently by Judge WRIGHT in *Com. v. Hooe*, 187 Pa. Superior Ct. 330, 333, 144 A. 2d 580: "As re-stated by Mr. Chief Justice STERN in Commonwealth v. Nasuti, 385 Pa. 436, 123 A. 2d 435, the rule is that, in order to warrant a conviction, 'the circumstances proved should be such as reasonably and naturally to justify an inference of the guilt of the accused, and of such volume and quality as to overcome the pre-

sumption of innocence and satisfy the jury of the accused's guilt beyond a reasonable doubt'. See also Commonwealth v. Olitsky, 184 Pa. Superior Ct. 144, 133 A. 2d 238. Possession may be joint as well as several: Commonwealth v. Thurman, 167 Pa. Superior Ct. 642, 76 A. 2d 483. It involves power of control and intent to control: United States v. Curzio, 170 F. 2d 354." Accordingly, two persons may be found to be in possession of narcotics where the circumstances, as in this case, indicate the power of control and the intent to exercise joint control over the narcotics. The offense, as defined in the act, does not require that the narcotics be found on the defendant's person, as in the case of carrying concealed weapons. The language of the narcotics act with which we are here concerned, provides that "No person shall have in his possession or under his control ... any of said drugs."

The facts in the *Hooe* case are analogous to those in the present case. In the *Hooe* case, Hooe and a companion were taking flight from the police who were giving chase in another car. When the officers saw an envelope fly out of the window on the driver's side of the escaping auto, they stopped to investigate. The envelope contained 10 packages of heroin. In spite of the fact that the evidence showed that Hooe was on the guest side of the auto, sitting next to the driver, at the time when the drugs were thrown out of the window, we held that the Commonwealth had shown sufficient circumstantial evidence from which it could be inferred that possession of the drugs had been joint. There is additional circumstantial evidence of joint possession in the instant case which was not present in the *Hooe* case. A hypodermic needle containing a residue of heroin, an eye dropper, a metal bottle cap and absorbent cotton were found at the scene of the arrest. These implements, which are commonly used to cook and dissolve the powdered heroin in drops of

water before the solution is strained and placed in a hypodermic needle, clearly evidenced a joint intention to immediately share the drugs. Pinckney would have been able to use immediately a part of the drugs had not the police intervened.

In addition, Pinckney was accused by Grantz of being the one who intended to use the drugs and the one responsible for the presence of the narcotics and the instruments in Grantz' home. We also have in addition the statement by Pinckney that he and his friend were "both in this thing together." This was an admission that he was engaged in a joint affair relating to the drugs.

Pinckney also gave conflicting stories for his presence at Grantz' home. His first account was made to Officer Kelly that he and Grantz were involved together with regard to the drugs. He then made a written explanation to the authorities in which he said that he came to Grantz' home pursuant to an understanding with Grantz that they were to share the narcotics. He stated that when he arrived at Grantz' home he went to a room on the second floor and was watching Grantz package the powdered drugs for the purpose of dividing the powder and that just as Grantz had finished this act the police arrived and Grantz threw the drugs out the window. At the trial Pinckney testified that he had gone to Grantz' home to inquire about a job and that he did not know the narcotics were at the house prior to his arrival nor did he bring any narcotics or narcotic-user implements to the house. He also testified that he never made a statement to Officer Kelly. The fabrication of false and contradictory accounts by an accused criminal, for the sake of diverting inquiry or casting off suspicion, is a circumstance always indicatory of guilt: *Com. v. Homeyer,* 373 Pa. 150, 158, 94 A. 2d 743. See also *Com. v. Cerzullo,* 175 Pa. Su-

perior Ct. 330, 104 A. 2d 179; *Com. v. Lewis,* 193 Pa. Superior Ct. 508, 165 A. 2d 98.

In our opinion the evidence produced in this case was sufficient to support the verdict.

Judgment of sentence affirmed.