## Commonwealth v. Borens

*J. Bradley Taylor* and *Richard Devlin,* Assistant District Attorney, for Commonwealth.

*Roger Reynolds* and *E. Harris Baum,* for defendants.

GROSHENS, J., June 17, 1963.—This case is before the court on motions by defendants in arrest of judgment and for a new trial.

Defendants were tried before the writer of this opinion without a jury and found guilty of arson and conspiracy to commit arson.

The evidence, considered in the light most favorable to the Commonwealth, shows the following:

One of the defendants, Edward Borens, owned a retail shoe business. He employed the other defendants, Samuel Mergamin and Erwin Morris, in this business. Mergamin, as general manager, was in charge of inventory, and Morris was responsible for purchasing ladies' shoes.

In April of 1959, Borens opened a shoe store at 118 Fayette Street, Conshohocken, which he continued to operate until the fire in question occurred at this location on April 13, 1961. In February, 1961, Borens obtained an additional retail outlet in Clifton Heights, Delaware County, and he started another store in Mt. Airy, Philadelphia, during March, 1961. Mergamin and Morris started to work for Borens about the beginning of 1961. In February, 1961, Borens hired Robert A. Borzelleca to manage the Conshohocken store.

In May, 1959, Borens took out $8,000 in fire insurance on the contents of the Conshohocken store. This was increased to $10,500 in July, 1959, and to $20,000 in March, 1960. On January 25, 1961, the stock insurance was increased to $45,000, and $20,000 in loss of earnings insurance was added. Theretofore, this latter type of insurance had not been carried.

Business at the Conshohocken store had been falling off prior to the fire. Gross sales at this store during the period from January 1, 1961, to April 9, 1961, totalled $3,986.54 as compared with $7,445.86 in gross sales for the same period the previous year. The week prior to Easter Sunday, April 2, 1961, the store had gross sales of $525.24, as compared with the Easter week of 1960, when gross sales were $1,280.17, and the Easter week of 1959, when gross sales were $2,034.09.

In March of 1961, Morris and Mergamin purchased 83 cartons of single shoes for $85 from a Joseph Pelberg, who was in the business of purchasing single shoes and matching them in pairs for sale to retailers. Pelberg would obtain large numbers of single shoes, sort them over, and try to mate similar shoes of the same or nearly the same size. He had already tried unsuccessfully to mate the shoes which he sold to Morris and Mergamin, and he told them this before they made the purchase. Each of the 83 cartons contained 100 to 150 single, rubber soled shoes with canvas tops.

They were shipped to the Conshohocken store and placed in the basement there. Mergamin told Borzelleca to hire some boys to match these shoes in pairs of the same color regardless of size or style, and to put the pairs in used shoe boxes and place them on some shelves in the basement. Borzelleca obtained three boys, 13 years of age, who did this work after school and on Saturdays, finishing the job three or four days before the fire.

The Conshohocken store was located in a building which faces east on Fayette Street, and has a width of approximately 19 feet and a depth of approximately 57 feet. The building shared a party wall with a laundromat to the north and a party wall with a dress shop to the south. Borens leased the first floor and the basement from the owner, and his lease still had a year to run when the fire occurred. The shoe store was located on the first floor with an office in the rear. Along the south wall of the building there were two stairways leading to the basement, one in the front of the store and one in the rear. The front half of the basement was divided from the rear by a wooden partition. There was a door in the partition with a bolt on the east side of the door. In the front half of the basement there were four racks of shelves, each parallel to the partition, and each having one end attached to the north wall. The rack nearest to the rear was 78 inches in front of the partition. There were 35-inch aisles between the racks, and a 70-inch aisle between the south ends of the racks and the south wall. The two racks nearest the partition each consisted of two wooden shelves two feet wide, one four inches above the floor, and the other 28 inches above the floor. The shelves were open on both sides.

The boys stacked the boxes of mismated shoes on the two racks of shelves nearest the partition, piling the loose shoes which were left over when they ran out

of boxes on the second rack from the partition. The other two racks held conventional pairs of shoes. At the time of the fire there were 200 to 250 pairs of shoes in the store excluding the mismated shoes.

The second floor of the building contained an apartment leased by a Neil C. O'Brien who lived alone.

On Thursday, April 13, 1961, Borzelleca was attending the Conshohocken store by himself. The store was open that night until 9 p.m. because of a special sale being promoted by the local chamber of commerce. Borens and Morris were working at Clifton Heights, and Morris left to go to the Conshohocken store arriving there at 8:15 or 8:30 p.m. Mergamin arrived at the Conshohocken store approximately fifteen minutes later carrying a box containing plastic material with a smaller, closed box inside. When Borzelleca went to look in the box Mergamin told him it did not concern him. Mergamin put the box near the top of the front stairway to the basement, and Borzelleca did not see it again. Morris and Mergamin went to the basement, allegedly to count the shoes which the boys had placed on the shelves. Borzelleca followed and stood on the stairs. Mergamin stood near the stairs talking to Borzelleca. Morris went alone between the racks where the mismated shoes were stacked. Mergamin told Borzelleca to summon Neil O'Brien from the apartment upstairs because Mergamin wanted to see O'Brien about a pair of shoes. Borzelleca, followed by Mergamin, went up and looked for O'Brien but could not find him. Borzelleca and Mergamin then returned to the basement where all three men occupied the same places as before. The phone rang and was answered by Borzelleca. It was Borens calling and Mergamin talked to him. They then returned to their prior positions in the basement. Morris then sent Borzelleca up to the first floor to get a piece of paper. Borzelleca got the paper from the office and returned to his place on the stairs.

Morris then suggested that they leave, and they went upstairs. Mergamin cleared the cash register leaving $25 in the drawer, a routine which he usually performed on Mondays. Borzelleca checked to see that the doors were locked, and they left at 9 p.m.

Between 9:15 and 9:18 the store was found to be filled with smoke. At approximately the same time smoke started to seep into the laundromat next door along its south wall, eight to ten feet from the front of the building, and smoke was noticed coming from the baseboard on the north side of the apartment over the shoe store.

The fire alarm sounded at 9:18, and engines from the fire company located two blocks away arrived at 9:20. At approximately 9:25, a fireman saw fire coming up through the floor on the first floor along the south wall of the building near the rear stairway. The fireman withdrew from the building overcome by the smoke he had encountered on the first floor.

A hole was cut in the floor of the store near the front and a hose with a revolving distributor delivering 600 to 700 gallons of water per minute was lowered into the basement. This distributor operated almost continuously from 9:45 p.m. to 4:30 a.m.

A hole was cut in the roof, letting out enough smoke to enable the fire chief to get partway down the front stairway to the basement approximately one hour after the fire started. He saw two red balls of flame glowing through the smoke in the area of the two shelves nearest the partition.

Seven or eight fire companies were called to the fire, bringing 160 to 170 firemen to the scene. At least six lines of hose in the front of the building and six lines in the rear were used to fight the fire. Some of the lines were still in operation at 7 o'clock the next morning.

Two officers from the Pennsylvania State Police investigated the fire. They found that the partition in

the basement had fallen over toward the front of the store, but the door in the partition was still bolted shut. They found three separate areas in the basement where there had been unusually intense burning. Two of these areas were at the north ends of the two racks of shelves nearest the partition. The third area was on the other side of the partition just to the front of the rear stairway along the south wall. At this last point the fire had burned through to the first floor and proceeded up into the second floor which was severely damaged. On the first floor there was little fire damage except in the area where the fire burned through from the basement to the second floor.

Directly over the north end of the rack of shelves nearest the partition the joists were burned almost through, and directly over the north end of the next rack the effect was the same. Nowhere else in the basement were the joists nearly so severely burned as in these two places. At these points the joists were so badly damaged that they were unable to support the floor which had dropped and was resting on some pipes.

The top shelf of the rack nearest the partition had burned through from the underside near its north end. The rest of the shelf was only slightly damaged. Near the north end of the top shelf of the next rack there was a hole burned completely through the one inch plank from the top. The hole was approximately six inches in diameter, and the rest of this shelf was only slightly damaged.

The persons investigating the fire opened 160 to 190 shoe boxes which they found on or beside the two racks of shelves nearest the partition. Every box opened contained a pair of shoes that did not match.

After the fire Borens told Borzelleca to tell people that he (Borzelleca) was the only one in the store that night, and Borens told this story to an investigator.

Upon questioning, Morris said that the Conshohoc-

ken store had once been the distribution center for stock to be used in the other stores, but that recently the Mt. Airy store had been used for this purpose.

Borens submitted an insurance claim of $39,042.14 for stock allegedly lost in the fire. The bulk of the damaged merchandise had been purchased shortly before the fire at a cost of $85 plus hauling charges from Philadelphia to Conshohocken.

Three facts must be proved to sustain a conviction in an arson case:

1. That there was a fire;
2. That it was of incendiary origin;
3. That defendants were the guilty parties: Commonwealth v. Nasuti, 385 Pa. 436 (1956). There was ample evidence presented to establish all three of these elements beyond a reasonable doubt.

There is no question as to whether there was a fire, and it is clear that it was of incendiary origin. No other explanation can reasonably account for the unusual and involved circumstances surrounding the event.

The prior substantial loss of business at the store; the recent large increase in fire insurance on the stock contained in the store; the recent taking of interruption of business insurance; the large volume of recently boxed mismated shoes stacked on shelves in the basement; the very rapid progress of the fire in separate parts of the basement almost momentarily after two of the defendants had been in the basement; the abnormal severity of the fire in three distinct and separate locations, two of which coincided with the locations of the mismated shoes; the abnormal patterns of burning in the areas of the two racks of shelves holding the mismated shoes; and the removal of the cash from the register prior to leaving the store; all combine to remove any reasonable doubt as to the origin of the fire.

The evidence indicates that the mismated shoes were of such trifling value as to make them virtually un-

merchantable and unsuitable as gifts. Defendants insist that the mismated shoes were to be mated as to style and size, altered, dyed, and used as inexpensive leader items in a new store which they planned to open that spring at the seashore. This does not explain why they were placed in boxes in a completely unsalable condition. Mergamin claimed that he gave instructions to have the shoes mated as to size and style, but this is contradicted, and it is incredible that a mistake could have been made as to such obvious and important directions. A satisfactory reason is not given for the hiring of inexperienced school boys on vacation to make decisions on size, color, style and mating of shoes to be offered to the public by a business enterprise.

There was no explanation offered for the locations and rapidity with which the fires burned. Twenty-five minutes after two of the defendants left the basement a fire had burned through the first floor from the basement on the other side of the partition from where, admittedly, they had been making an inventory of the virtually worthless mismated shoes boxed by the boys. In the basement, below the spot where the fire burned through to the first floor, there was nothing to cause such an intense fire, unless some accelerant was placed on the cardboard cartons stored there. There are two other places where the evidence indicates that an accelerant was used. There is no other explanation for the intense burning in two distinct spots on the two shelves where the boxed mismated shoes were placed. Boxes of canvas and rubber shoes alone could never have caused the flames which burned the overhead large joists nearly completely through, and left the shelving under these shoes not badly damaged except in two small areas. The manner in which one of these shelves was burned through from the top in an irregular hole with fairly neat edges indicates that some accelerant was poured onto the top of it. Obviously, it was impor-

tant that these virtually worthless shoes be badly damaged if there was to be a profitable recovery on the stock fire insurance. These shoes purchased at a cost of $85 plus cartage, formed the bulk of the damage claim of $39,042.14.

The investigators from the Pennsylvania State Police found nothing that could have caused the fire naturally or accidentally. There was no electrical wiring and no heater near where they fixed the origins of the fire. The burning patterns indicated to them that the origin of the fire was in more than one place and was incendiary.

All three of the defendants were linked by the evidence to the cause of the fire. Mergamin and Borens saw to having the fire insurance increased. Mergamin and Morris purchased the useless shoes. Mergamin and Morris were present when the fire was lit. Borens had to be a party to the scheme, because he was the one who could collect on the insurance. Borens lied about the presence of Mergamin and Morris in the store that night. There is no doubt that the three of them planned the fire, and that all three took part in the execution of their plans.

Counsel for defendants have submitted a brief which includes a photograph of the rack of shelves nearest the partition. It is claimed that the photograph was discovered after the trial, and that it shows properly mated shoes on this rack. Without accompanying testimony it is impossible to tell what the photograph does show, and it is not properly a part of the evidence in this case.

Defendants also maintain that the delay of approximately five and one-half months before their arrest was prejudicial in that it prevented them from making an adequate investigation of the site of the fire in preparing their defense. From the beginning, defendants were aware that the fire was being investigated. Borens

obtained control of the premises on Wednesday, April 19, 1961, when he took an inventory of the damaged stock. On Friday, April 21, 1961, the State police gave Borens express indication that all three of the defendants were suspected of committing arson together. Sergeant Mays testified that he accused Mergamin of arson on April 21, 1961, and that he accused Morris of the same crime on April 25, 1961. Defendants had ample warning of possible charges against them and were free to make any investigation they chose.

And now, June 17, 1963, defendants' motions in arrest of judgment and for a new trial are denied. Defendants are directed to appear for sentencing on Friday, June 28, 1963, at 9:30 a.m. in Court Room "A", Court House, Norristown, Pa.