433 A.2d 489

COMMONWEALTH of Pennsylvania,

v.

Ralph SMITH, Appellant.

Superior Court of Pennsylvania.

Submitted Sept. 11, 1980.

Filed Aug. 7, 1981.

Petition for Allowance of Appeal Denied Dec. 3, 1981.

358

John Thomas, Assistant Public Defender, Wilkes-Barre, for appellant.

Chester B. Muroski, District Attorney, Wilkes-Barre, for Commonwealth, appellee.

Before SPAETH, HESTER and CAVANAUGH, JJ.

CAVANAUGH, Judge:

In this case the appellant, Ralph Smith, was tried before President Judge Brominski and a jury. He was convicted of theft by unlawful taking of a CB radio and conspiracy with respect to that offense, robbery and theft by unlawful taking, receiving stolen property, criminal conspiracy and conspiracy to commit arson. The court granted the appellant's motion in arrest of judgment as to the charge of conspiracy to commit theft of the CB radio and denied it as to all other charges. Appellant was sentenced to imprisonment for not less than five nor more than ten years for criminal conspiracy and five to ten years imprisonment for conspiracy to commit arson, the sentences to run concurrently. Sentence was deferred on the other charges.

Appellant was involved in bizarre and heinous offenses which were committed in the Hazleton area of Luzerne County on February 13 and 14, 1976. On February 13, 1976, at about 9:00 p. m., Mrs. Holak was alone in her home in Trucksville, Pennsylvania. The doorbell rang but she did not answer it as she was not expecting anyone at so late an hour. The doorbell rang again and as she went toward the front door she heard a loud noise coming from the area of the kitchen. She became frightened and telephoned her husband at his pharmacy where he was still working. As she put the receiver down she observed a black man standing in the living room who told her to keep her head down. He inquired as to where the money and the safe were located and she replied that she had neither a safe nor money. At the same time she also saw another man with a shotgun pointed towards her. The second man was described by Mrs. Holak as a big and bulky and was disguised by wearing a ski mask. The black man proceeded to tie Mrs. Holak's wrists and ankles with a cord from a venetian blind. He repeatedly stated to her "we don't want to hurt you, but we will if we have to. We want you to tell us where the money is and where the safe is." The intruders went into two of the three bedrooms of the Holak residence which were located on the first floor of the ranch type house and

searched through drawers and closets. Before the third bedroom was reached a horn sounded outside the house and the witness observed the two men run through the kitchen area and out of the house. Between forty and ninety dollars were taken by the intruders. A short time later Mr. Holak arrived home and the State police were called. The police arrived at about 9:30 within a few minutes of the call and found that the kitchen door had been smashed open.

The testimony established that Henry Magnum was the black man described in the incident and he testified that he went to Hazleton, Pennsylvania on February 13, 1976 and met with the appellant, a man who was 57 years of age, as well as with James Sandutch and James Mastrota. The four set out in the appellant's station wagon to a house targeted by Sandutch for breaking into as one containing illegal money and where the owner was reportedly on vacation. After observing the house they decided not to enter.

Subsequently, Mr. Smith drove the four occupants of the vehicle to the Holak residence at Mastrota's direction. Appellant parked the car and Mastrota instructed him to blow the horn if another car came along. Mastrota, Sandutch and Magnum then went to the house and when the doorbell was unanswered Mastrota kicked in the kitchen door and the three men entered. Mr. Magnum testified that while the three men were in the house in the process of robbing the victim, the appellant blew the station wagon horn according to the prearranged signal and the three fled the house.

The four then returned to Hazleton with Mr. Smith still operating his car as events had not turned out as they had planned in Trucksville. The men then stopped at Mastrota's house to obtain a glass milk bottle. Subsequently, they placed gasoline in the bottle which was to become a deadly firebomb later in the evening. Mr. Smith then drove the group to a parking lot next to a club known as Dino's Lounge. This was apparently sometime about midnight. Mastrota got out of the car and smashed the window of a parked automobile, removed a CB radio which he brought back to the appellant's car and gave to the appellant. Sub-

sequently, the four men drove to the Boyarski residence, with appellant still operating the car, which was located a few miles from Dino's. The purpose of this trip was to firebomb the Boyarski residence which crime had been planned by Mr. Sandutch sometime before. When they got to the house the appellant said that it was too early to firebomb the house as there were too many cars around and the lights were still on in the house. The group then decided to drive on to Weatherly. Apparently Sandutch had another "job" lined up in Weatherly but no crimes were committed there. Sometime after midnight the appellant became tired and went home. Mastrota's car was parked at appellant's home and after appellant retired to his house Sandutch, Mastrota and Magnum continued in Mastrota's car. At about 2:00 a. m. on February 14, 1976, the three men returned to the Boyarski residence and found the lights out. Mastrota threw the firebomb, consisting of gasoline in a milk bottle set off by a blazing rag, through a window of the Boyarski residence. The plan to firebomb the home had been made by Sandutch about a week before. Sandutch and Mastrota actually participated in the firebombing and Magnum remained in the car. Within minutes the home was an inferno. An eyewitness stated that: "every window looked like a blast furnace, upstairs and downstairs..." The fire was so intense that the furnishings in the dining room were totally consumed. As a result of the arson five members of the Boyarski family who were in the home at the time, perished.

Appellant testified in his own behalf that he had nothing to do with any of the criminal events described above and that on the contrary he was at Grace Upshaw's house playing cards from about 9:00 p. m. on February 13, 1976, to noon the next day.

On appeal, appellant presents four issues for our consideration: (1) the court below erred in refusing to grant appellant's motion for change of venue; (2) the court erred in admitting the transcript of the testimony of James Mastrota which testimony was given at the appellant's preliminary

hearing; (3) the evidence was insufficient to sustain the appellant's convictions for theft of the CB radio and conspiracy to commit arson; and (4) prosecutorial misconduct by the district attorney requires the grant of a mistrial.

Appellant's first contention is that the court should have granted his motion for change of venue. At the hearing on the motion before Judge Brominski, counsel for the prosecution and defense counsel agreed that the exhibits entered in the Mastrota matter would constitute the record for the motion for change of venue.[1] At the hearing for change of venue counsel for appellant concentrated on the fact that in the newspaper articles and television reporting it was stated that the appellant was charged with conspiracy to commit five murders when in truth he was charged with conspiracy to commit arson. President Judge Brominski properly found that this error with respect to the charges against appellant was insufficient to grant the change of venue.[2] Judge Podcasy's opinion which Judge Brominski referred to stated:

A great number of pre-trial exhibits were offered and received in evidence. These exhibits, mostly newspapers

1. The Court stated in this respect:
BY THE COURT: I would have to insist upon that, because actually Mastrota was presented to me in the light of Sandutch and Katona. That is the basic record involved in this situation. I would have to insist upon—not insist, but I would direct that in that particular regard as I did of the lawyers in Mastrota that the relevant portion of Judge Podcasy's decision in Sandutch and Katona should be incorporated into this particular record for my consideration.

I say to you now that I am adopting—again I spent considerable time reviewing Judge Podcasy's decision, reading the cases involved therein, and for the reasons advanced by Judge Podcasy in his decision I would deny the motion for change of venue and note the Defendant an exception.

2. With respect to the inaccurate reporting the court stated:
BY THE COURT: No, because I read the events of the Katona preliminary hearing in June, the Smith preliminary hearing in June, that was in June and I remember your cross examination of the Commonwealth's witnesses and everything surrounded basically the charges we are talking about today. If there was some reference inadvertently with being charged with conspiracy for murder I don't think that is sufficient to take this out of the classification of Sandutch and Katona.

of daily circulations, represented a quantity of publicity disseminated by the Hazleton Standard-Speaker having an average daily circulation of 24,000 subscribers in the greater Hazleton area, and by the Wilkes-Barre Times Leader Evening News, whose daily circulation in the Wyoming Valley or Greater Wilkes-Barre area is 68,000. Television viewers of WBRE–TV, WDAU–TV and WNEP–TV consisted of some 100,000 viewers of each channel, while Radio Stations WBRE, WBAX, WGBI, WARD, WMJW, WAZL and WLSH carried a great deal of newscasts involving the defendants [Sandutch and Katona] to their many listeners. The news coverage extended from the period of the defendants' [Sandutch and Katona] arrests on or about May 12, 1976, through the date of the arraignments on September 1, 1976, although sporadically during the months of June, July and August, picking up considerably from the date set for the joint trials, viz., September 27, 1976, to the present.

Defendants [Sandutch and Katona] urge that massive and inflammatory pre-trial publicity in Luzerne County has precluded the possibility of their being granted a fair and impartial trial, and that a change of venue is thus warranted.

In the instant case appellant argues that the publicity was so pervasive and extensive that it caused almost all of the jury panel to form a fixed opinion. Many of the jurors were familiar with the incidents involved in the case and had read about them in the newspapers, heard about them on television or otherwise became familiar with the events. A review of the voir dire reveals that while many of the jurors knew the Holaks and had heard about the case through newspapers, television or local gossip that they did not have fixed opinions concerning the appellant's guilt or innocence and were able to act fairly and impartially.

An application for change of venue is addressed to the sound discretion of the court and its exercise of that discretion will not be disturbed by an appellate court in the absence of an abuse of discretion. *Commonwealth v. Tolas-*

*si*, 489 Pa. 41, 413 A.2d 1003 (1980). In cases where prejudicial pre-trial publicity is alleged, the trial courts should consider: whether the pre-trial publicity revealed the existence of the accused's prior criminal record; whether the publicity referred to a confession, admissions or re-enactments of the crime by the defendant; and whether such information is the product of reports by the police and prosecutorial officers. *Commonwealth v. Heath*, 275 Pa.Super. 478, 419 A.2d 1 (1980). The presence of one of these elements does not in itself warrant a presumption of prejudice. Inquiry must be made to determine whether such publicity has been so extensive, sustained and pervasive that the community must be deemed to have been saturated with it. *See Commonwealth v. Kivlin*, 267 Pa.Super. 270, 406 A.2d 799 (1979).

Our Supreme Court has stated: "It is clear that the mere existence of pre-trial publicity does not warrant a presumption of prejudice. Similarly, a possibility that prospective jurors will have formed an opinion based on news accounts will not suffice." *Commonwealth v. Casper*, 481 Pa. 143, 152, 392 A.2d 287, 291-2 (1978). Even extensive pre-trial publicity within a county does not necessarily preclude a fair trial in that county. If the court is satisfied that an objective, open-minded jury can be selected from the members of the community exposed to the publicity it need not grant a change of venue. *Commonwealth v. Powell*, 459 Pa. 253, 328 A.2d 507 (1974). We are satisfied in this case that the court below properly considered the appropriate guidelines in determining whether the appellant had been prejudiced by pre-trial publicity and that it did not abuse its discretion in refusing to grant a change of venue.

One final word should be added with respect to appellant's request for a change of venue. He argued that the motion for change of venue should have been granted because television cameras were permitted to be set up outside the courtroom doors and the appellant was televised wearing handcuffs on the date of his arraignment. There is nothing in the record to support appellant's allegation concerning the

presence of television cameras and accordingly such argument will not be considered on appeal.

■■■■ Appellant next contends that the court below erred in admitting a transcript of testimony of James Mastrota, Sr., which was given at the appellant's preliminary hearing. At that time Mastrota was cross-examined by appellant's counsel. At the appellant's trial, Mastrota exercised his privilege under the Fifth Amendment to the United States Constitution and refused to testify. Testimony from a preliminary hearing is admissible against a defendant where the defendant had an opportunity to cross-examine the witness at the earlier proceeding and such witness is not available to testify at trial. *Commonwealth v. Hall*, 232 Pa.Super. 412, 334 A.2d 710 (1975). Invocation of the Fifth Amendment at appellant's trial rendered Mastrota "unavailable" to testify. *Commonwealth v. Rodgers*, 472 Pa. 435, 372 A.2d 771 (1977). Appellant cites *Commonwealth v. Clarkson*, 438 Pa. 523, 265 A.2d 802 (1970) in support of his contention that the transcript of Mastrota's testimony was inadmissible. The *Clarkson* case, *supra*, does not assist appellant and on the contrary may be cited to support the correctness of the lower court's decision to admit Mastrota's testimony. The court stated in *Commonwealth v. Clarkson*, 438 Pa. 523, 265 A.2d 803:

> While it is true that the focus of a preliminary hearing is narrower than that of a trial, we are not persuaded that the difference requires exclusion of the testimony taken at such a hearing. Our basic concern is for the reliability of the testimony which was elicited in the preliminary hearing, and we do not feel that its reliability is affected by the scope or focus of the proceeding. It would certainly be more desirable to have the witness present at trial, but it would be vastly less desirable to exclude such evidence altogether.

Appellant argues that a transcript should be used only if there is no other evidence against the defendant except that furnished by the "unavailable" witness. We do not so read the opinion in *Clarkson, supra*. Further, in this case the evidence by Mastrota was a very important part of the

Commonwealth's case. As we discuss subsequently in this opinion, the appellant argues that the evidence, even with Mastrota's testimony, was insufficient to sustain some of the charges against him.

 Appellant challenges the sufficiency of the evidence to support his convictions for theft of the CB radio and conspiracy to commit arson. In judging sufficiency, we view the evidence, and all inferences arising from it, in the light most favorable to the verdict winner. *Commonwealth v. Hoskins*, 485 Pa. 542, 403 A.2d 521 (1979); *Commonwealth v. Smith*, 484 Pa. 71, 398 A.2d 948 (1979); *Commonwealth v. Posavek*, 278 Pa.Super. 265, 420 A.2d 532 (1980). With respect to the theft of the CB radio at Dino's Lounge the evidence was convincing that appellant drove his station wagon to Dino's in the company of Sandutch, Mastrota and Magnum. Once in the parking lot Mastrota and Sandutch got out and smashed the car window in an automobile belonging to a Mr. Petrone. After removing the radio Mastrota returned to Smith's vehicle and gave the radio to him. The jury was justified in finding that appellant participated in the crime as a principal.

 The evidence was also sufficient to sustain his conviction of conspiracy to commit arson. The heart of the offense of conspiracy is an agreement to do an unlawful act. *Commonwealth v. Anderson*, 265 Pa.Super. 494, 402 A.2d 546 (1979). The agreement required for conspiracy can seldom be directly proved, nor need it be. *Commonwealth v. Stephens*, 231 Pa.Super. 481, 331 A.2d 719 (1974). A conspiracy may be inferentially established by showing the relations, conduct or circumstances of the confederates which demonstrate a unity of purpose to accomplish an unlawful act. Appellant was the operator of the vehicle when Mastrota went home to get a milk bottle into which gasoline was subsequently placed to make a firebomb. This occurred prior to appellant driving the group to Dino's Lounge. After leaving Dino's Lounge appellant drove the men to the Boyarski home which Sandutch had planned on firebombing. Appellant told his fellow conspirators that it was too early to commit the act as there were too many cars around and

the lights were still on. Notwithstanding appellant's withdrawal from the group prior to the actual firebombing his conduct points unerringly to his part in the nefarious scheme that led to the destruction of the Boyarski home by fire and to the death of the five occupants.

Finally, appellant contends that he was denied a fair trial because of a remark by Patrick Toole, the prosecutor at appellant's preliminary hearing, which was read as part of the transcript of Mastrota's testimony. The statement by Mr. Toole was "When you do as much as they've done, three hours is absolutely meaningless." [3] The trial judge cautioned the jury to disregard any general statements concerning appellant's guilt or innocence. To support

3. The relevant part of the proceedings is as follows:
ANZALONE: [Defense counsel] So you could have left Trucksville somewhere around 11:30?
MASTROTA: I don't know.
TOOLE: [District Attorney] Or earlier. If the magistrate please, I don't mind, you know, I have been trying to be tolerant as to the extent of cross-examination, but the witness' testimony was that one he did not know that time. It might have been 9:00, it might have been 10:00, it might have been 11:30.
ANZALONE: If your Honor please, this witness recalls other things and certainly the importance of this case would make him recall—The events of the evening would make him recall approximate times. Something can't be three hours apart.
TOOLE: When you do as much as they've done, three hours—
MR. ANZALONE: Your Honor, I object at this time and move for a mistrial. I move that statement by the District Attorney, when you've done as much as they've done, three hours is absolutely meaningless, is a highly prejudicial remark by the prosecution and I ask for a mistrial.
BY THE COURT: Motion denied. Members of the jury, I'm sure you are all aware of the fact that we are concerned about determining the guilt or innocence of the defendant based on the testimony you hear from the witnesses on the witness stand and any general statement as to his guilt or innocence is totally unacceptable and I ask you to disregard it. I ask you to listen to this particular testimony on the case and base your ultimate determination on it, please.
ANZALONE: I object to that, your Honor. I object to that as being a very prejudicial remark.
THE COURT: Objection overruled. The court would state to have counsel refrain from trying to state that it was sometime between the hours, the number of events involved. It wasn't a stop-watch performance where time was of the essence, precise time.

his contention that a mistrial should have been granted appellant relies on *Commonwealth v. Valle*, 240 Pa.Super. 411, 362 A.2d 1021 (1976). In the *Valle* case the prosecutor branded the defendant as "vicious", a "liar" and an "Al Capone". He further implied that the presumption of innocence would prove difficult to apply to the defendant. The case before us is clearly distinguishable. In the circumstances of this case it is difficult for us to conceive that the statement arose to the level of prosecutorial misconduct. In any event, a new trial is not mandated every time a prosecutor makes an improper remark. *Commonwealth v. Perkins*, 473 Pa. 116, 373 A.2d 1076 (1977). To constitute reversible error the language must be such that its "unavoidable effect would be to prejudice the jury, forming in their minds fixed bias and hostility towards the defendant, so that they could not weigh the evidence and render a true verdict." *Commonwealth v. Stoltzfus*, 462 Pa. 43, 61, 337 A.2d 873, 882 (1975). *See also Commonwealth v. Dreibelbis*, 493 Pa. 466, 426 A.2d 1111 (1981). In this case we perceive no error in the Court's denial of the motion for mistrial.

Judgment of sentence affirmed.