454 A.2d 1027

**COMMONWEALTH of Pennsylvania**

v.

**Louis P. DiNICOLA, Appellant.**

Superior Court of Pennsylvania.

Argued Sept. 30, 1981.

Filed Nov. 30, 1982.

Reargument Denied Feb. 10, 1983.

Petition for Allowance of Appeal Granted June 24, 1983.

538

Harold Gondelman, Pittsburgh, for appellant.

Shad Connelly, Assistant District Attorney, Pittsburgh, for Commonwealth, appellee.

Before CAVANAUGH, MONTEMURO and VAN der VOORT, JJ.

CAVANAUGH, Judge:

Appellant, Louis P. DiNicola, was convicted of arson and three counts of murder in the second degree following a jury trial before McClelland, J. Following denial of his motions in arrest of judgment and for new trial he was sentenced to three consecutive life sentences. He has appealed from the judgment of sentence.

 Appellant's first contention is that the evidence is insufficient to sustain his convictions. The test for sufficiency of evidence in a criminal case is whether the evidence admitted at trial is sufficient to prove every element of the crime charged beyond a reasonable doubt. *Commonwealth v. Davis*, 491 Pa. 363, 421 A.2d 179 (1980). An appellate court must view the evidence in the light most favorable to the Commonwealth as the verdict winner, and accept as true all evidence and all reasonable inferences therefrom, upon which, if believed, the factfinder could properly have based its verdict. *Commonwealth v. Helm*, 455 Pa. 315, 402 A.2d 500 (1979). Further, it is the province of the trier of fact to pass upon the credibility of witnesses and the weight to be accorded the evidence produced. The factfinder is free to believe all, part or none of the evidence.

*Commonwealth v. Dumas,* 299 Pa.Super. 335, 445 A.2d 782 (1982). Applying these rules, the evidence may be summarized as follows: Appellant was a roofer employed by McCreary Roofing Company. After work on August 30, 1979, he went to the home of his friend, Michael Jefferson, and both men worked on Jefferson's truck which was parked in a driveway adjacent to his home. During the early evening, Debbie Sweet and her two children arrived home from shopping. She lived in the first floor apartment, in the building where Mr. Jefferson lived on the second floor with his mother and her fiance, Mr. Pitt. Ms. Sweet had only moved into her apartment about a week earlier with her eight year old daughter, Alisa, and four year old son, David. When Ms. Sweet arrived home she spoke to the appellant, whom she had never met before, and to Mr. Jefferson, with whom she had spoken on one previous occasion. She had a case of beer with her as she was having a house-warming party the next day and the appellant helped her carry the beer into her apartment. This was about 8:30 p.m. When Ms. Sweet arrived at her apartment both the appellant and Jefferson were working on the truck and were extremely dirty from their day's activities as roofers. Both men were drinking beer and smoking marijuana.

Shortly after Ms. Sweet and appellant entered her apartment, Michael Jefferson arrived. The three sat in the kitchen talking and drinking beer for a short time and about 9:00 p.m. Ms. Sweet put her two children to bed. Subsequently, the three smoked strong marijuana in the kitchen and appellant made a pass at Ms. Sweet which she rejected.[1]

---

**1.** The testimony of Ms. Sweet concerning the appellant's overtures was as follows:

Q. How do you mean he made a pass at you?
A. He, right after he did it, he—
Q. Did what?
A. I went and inhaled the smoke and he then reached out at me and I don't know, he touched my leg or something. He just pawed at me and right away I jumped back and said, "Wait a minute, mister, I'm not that kind."
Q. It wasn't violent, was it?

Later on, Ms. Sweet and appellant went into the living room and Jefferson left. Appellant sat on the floor of the living room as he was still in dirty work clothes. Jefferson returned shortly and was wearing fresh clothing. Appellant asked Ms. Sweet if he could take a shower as he lived a long distance away and Ms. Sweet agreed.

Ms. Sweet and Jefferson then engaged in petting in the living room until she had to go to the bathroom. Appellant was still showering and told her "to come on in, I won't look." She used the bathroom facilities and he said to her: "See, I didn't look" and Ms. Sweet replied "Good, it looks like I could trust you." After Ms. Sweet left the bathroom she went into her bedroom with Jefferson. She got undressed and got in bed with Jefferson and engaged in sexual activities. Ms. Sweet observed the appellant leave the bathroom and saw him in the hallway outside her bedroom. She testified upon direct examination:

Q. Describe the sounds as you heard them?

. . . . .

A. Well, from the moment I saw him, I heard a continual track of footsteps walk through the kitchen, into the den, into the living room, and then there was a blank pause, and then it walked back into the den, and I heard the door open.

. . . . .

Q. Now, you said you heard these footsteps go in a certain direction and go across certain floors. How could you tell which floor they were crossing?

A. Because the floors—the floors were different in the kitchen, the bathroom, and my bedroom. There was no wax linoleum flooring, which it was one sheet just laid and in the den and in David's bedroom and in the living room, they were old, real old hardwood floors and they creaked.

. . . . .

A. No, in fact, after I said that to him, he sat back, and I assumed that, you know, he understood, everything was straight and that was it.

Q. Could you tell from the sound where it was?

A. Yes, you could tell. You could tell very easily, it was the door in the den where my coats were.

Q. That would be where?

A. The door at the back of the stairway.

Q. The closet?

A. Yeah, it's a closet door right here (indicating). You could hear this open and then it shut, and then I heard these footsteps walk across here (indicating), and this door open (indicating), and then there was silence. Then suddenly, the footsteps just right away left.

Q. When you say, and left—

A. Well, it was at a faster pace and I could tell it went out the back door because of the sounds.

Q. What sound was there at the back door?

A. Well, it was our downtown city street sounds that when the door opened, you know, you're just aware that the back door has opened to the outside.

Q. Did you hear the back door close?

A. No.

Q. Did you remain in the bed after the steps went out the door?

A. Yes.

Q. What occurred in the bed at this time?

A. I was relieved that he left, because I was worried about him walking through my apartment. I was worried about my daughter, my stereo and my belongings. So, I was relieved he left and Michael had finished making love to me and he just laid there. And I just figured I'd get up soon and shut the door, get up soon and lock the door.

Ms. Sweet testified that she then dozed off with Jefferson sleeping on top of her. The next thing she knew she was awakened by noises in the kitchen and her testimony was as follows:

542

Q. What kind of noises?

A. They were somebody was in the kitchen and I thought it was one of the kids, you know, it was quiet and I thought it was one of the kids and I listened and the noise went—whoever it was went from the kitchen then went into the living room.

Q. The living room?

. . . . .

Q. Describe what you heard?

A. They were knocking into things, and at that point, I figured that that couldn't be one of my kids that were up. See, my kids would get up sometimes. David would get up or Alissa would get up and use the bathroom during the middle of the night or Alissa would get thirsty and get a drink of water and go back to bed. Well, this time instead of one of them walking around and going back to their bed, this person was knocking into things and—

Q. Let me ask you something at this point. From the time that you heard noises in the kitchen, just now you say you heard someone go through knocking into things—from that time until the later events, did you ever hear footsteps running out the back door?

A. No, never.

Q. Or walking out the back door?

A. Never.

Q. Was that the only door in and out of the apartment?

A. That was the only door accessible, yes.

Q. Now, you were willing to tell us about hearing someone walking around and knocking into things. What did you do or what did you continue to hear?

A. I knew there was something wrong and I tried to push Michael and then I heard this noise. Suddenly, there was smoke pouring over my ceiling, pouring through the doorway, it was just flowing in a very fast pace over the doorway. I could see it because the bath-

room light was on and you could just see the smoke, it was black and—

Ms. Sweet pushed Jefferson off her and jumped out of bed. The appellant was standing in the living room doorway staring at the fire in the living room which was burning furiously. Appellant stated to Jefferson "Come on, Mike, let's get out of here." Ms. Sweet attempted to save her two children but the fire and smoke were so extensive that she was unable to do so and they perished in the fire as well as Mr. Pitt who lived on the second floor. The fire was so severe that by the time the fire department arrived the flames were coming out of the entire front end of the house and also the sides in a blow torch effect. The flames spread to such an extent that they burned the building next door.

A thorough arson investigation was conducted by the state police which began on August 31, 1979. The investigators concluded that the fire was of incendiary origin having been intentionally set and that a flammable liquid had been placed on the floor in Ms. Sweet's apartment and ignited. The investigators were able to discern a liquid burn pattern and traced the root of the fire. It was also determined that the fire did not have a source in the electrical system nor was the resulting blaze caused by a smoldering fire. Samples of the floor board behind the stereo component were analyzed and determined to contain a flammable liquid known as stoddard solvent which is a kerosene class product and an accelerant. The investigators concluded that the primary point of origin was the floor in the area near Ms. Sweet's stereo. Stoddard solvent was kept in large quantities at the premises of McCreary Roofing Company where the appellant worked and was used to clean tar from tools. It was also used by the employees to clean up.

In order to prove arson under the Act of December 6, 1972, P.L. 1482, No. 334, 18 Pa.C.S.A. § 3301, the Commonwealth must prove beyond a reasonable doubt (1) a fire (2) which was incendiary in origin and (3) that the defendant

was the guilty party. *Commonwealth v. Colon*, 264 Pa.Super. 314, 399 A.2d 1068 (1979). *See also Commonwealth v. Dolan*, 287 Pa.Super. 202, 429 A.2d 1171 (1981). The defendant's guilt may be established by circumstantial evidence, especially in arson cases. *Commonwealth v. Nasuti*, 385 Pa. 436, 123 A.2d 435 (1956). "Indeed, it is clear that arson, by its very nature, is rarely committed in the presence of others, and a refusal to convict on circumstantial evidence alone would be tantamount to an invitation to commit the crime." *Commonwealth v. Colon*, 264 Pa.Super. 314, 325, 399 A.2d 1068, 1073 (1979). *See also Commonwealth v. Wisneski*, 214 Pa.Super. 397, 257 A.2d 624 (1969). In *Commonwealth v. Nasuti, supra*, the only evidence to tie the defendant in with a fire of incendiary nature was that a police sergeant observed the defendant, the proprietor of a small restaurant, standing in his restaurant with an unknown woman at about 12:55 in the morning. The officer continued walking his beat and shortly thereafter he heard fire engines and followed them to the source of the fire which was the restaurant. The officer returned to the restaurant at about 1:10 and the building was a mass of flames. Expert testimony established that the fire was incendiary in origin. There was evidence that the business was not very profitable but there did not appear to be any over insurance on the building fixtures. The court stated at 385 Pa. 444, 445, 123 A.2d 439:

It is not necessary, however, to speculate as to a possible or even probable motive, since it is elementary that, while motive may be an important factor, it is not incumbent on the Commonwealth, in order to make out a case, to prove the existence of any motive, much less of an adequate one: 14 Am.Jur. 786, § 27. All that is required is that, the evidence being circumstantial, the circumstances proved should be such as reasonably and naturally to justify an inference of the guilt of the accused, and of such volume and quality as to overcome the presumption of innocence and satisfy the jury of the accused's guilt beyond a reasonable doubt: *Commonwealth v. Marino*, 142 Pa.Super. 327, 334, 16 A.2d 314,

317; *Commonwealth v. Bausewine,* 354 Pa. 35, 41, 46 A.2d 491, 493; *Commonwealth v. Carey,* 368 Pa. 157, 163, 164, 82 A.2d 240, 242; *Commonwealth v. Kloiber,* 378 Pa. 412, 427, 106 A.2d 820, 828.

The circumstantial evidence in the instant case was sufficient to sustain the appellant's conviction of arson beyond a reasonable doubt.

The appellant contends that his conviction was based on mere suspicion of guilt. Suspicion is never accepted in a court of law as a substitute for proof. *Commonwealth v. Long,* 470 Pa. 204, 368 A.2d 265 (1977). Further, "before a conviction will be sustained, 'the facts and circumstances proved must be of such a character as to establish guilt beyond a reasonable doubt.' ... and, where a conviction is based entirely on circumstantial evidence, 'the theme of guilt must flow from the facts and circumstances proved, and be consistent with them all,' ". *Commonwealth v. Simpson,* 436 Pa. 459, 463–464, 260 A.2d 751 (1970). *See also Commonwealth v. Jones,* 291 Pa.Super. 69, 435 A.2d 223 (1981). It is also well established that mere presence at the scene of a crime is insufficient to prove involvement. *Commonwealth v. Goodman,* 465 Pa. 367, 350 A.2d 810 (1976); *Commonwealth v. Roscioli,* 454 Pa. 59, 309 A.2d 396 (1973); *Commonwealth v. Stanley,* 453 Pa. 467, 309 A.2d 408 (1973).

■ In the instant case the defendant's commission of arson was consistent with all the evidence introduced. It was not mere conjecture or guess which tied the appellant to the crime. He was not convicted merely because he was present at the scene. The evidence pointed to the appellant as the perpetrator of the crime of arson which caused the death of three persons. Conviction may properly rest upon circumstantial evidence alone. *Commonwealth v. Schilling,* 288 Pa.Super. 59, 431 A.2d 1088 (1981). *Commonwealth v. Harrison,* 289 Pa.Super. 126, 432 A.2d 1083 (1981); *Commonwealth v. Berrios,* 495 Pa. 444, 434 A.2d 1173 (1981).

Appellant. relies on *Commonwealth v. Carthon*, 467 Pa. 73, 354 A.2d 557 (1976) in which the Supreme Court found that the evidence did not support a conviction for arson and reversed the judgment of sentence. In that case the evidence established that a woman was in her apartment with her boyfriend, the defendant, who had a gasoline can with him. He explained that the gasoline was for a friend's car. The woman dozed off and when she awoke she discovered the gasoline can lying on the floor in a puddle of gasoline which she directed the defendant to clean up. The woman dozed off again and when she woke up the defendant was standing in front of her. She heard a loud noise and saw the gasoline blaze up behind the defendant. An assistant fire marshall testified that in his opinion the fire was incendiary in nature although he also stated that the gasoline could have been ignited by static electricity. He also admitted that a burning cigarette in a nearby ashtray could have started the fire. Appellant claimed that the gasoline can fell off the table and when he reached for a mop which was in a nearby closet, the gasoline erupted. The Supreme Court held in reversing the judgment of sentence, opinion by Manderino, J. (Jones, C.J., not participating) that the most that could be deduced from the prosecution's evidence was that the defendant brought the gasoline into the woman's apartment and that the defendant was the only person near the gasoline when it ignited. The court held that there was insufficient proof that the defendant wilfully and maliciously set fire to the apartment.[2]

The *Carthon* case is readily distinguishable from our own. In *Carthon* the evidence was insufficient to establish

2. Appellant was charged in *Commonwealth v. Carthon*, with arson under the Act of June 24, 1939, P.L. 872, § 905, 18 P.S. § 4905 and it was stated at 467 Pa. 76, 77, 354 A.2d 558:

"Whoever, willfully and maliciously, sets fire to or burns, or causes to be burned, or who aids, counsels, or procures the burning of any dwelling house ... whether the property of himself or of another, is guilty of arson." 1939, June 24, P.L. 872, Sec. 905. In order to prove that arson has been committed, the prosecution must establish beyond a reasonable doubt (1) that there was a fire, (2) that it was willfully and maliciously set, and (3) that the defendant was the guilty party.

that the fire was maliciously and wilfully set. In other words, it was not necessarily incendiary in nature. In our case the appellant does not contest that the fire was incendiary in nature, and there was sufficient evidence to establish that it was.[3] The appellant's contention that the only evidence to establish his guilt is that he was present when the fire started is without merit.[4] There was much more evidence to hold appellant criminally responsible for the fire than his mere presence at the scene. Ms. Sweet heard the appellant leave her apartment; she heard someone return and heard the unusual pattern of that persons movements in her apartment and there was no indication that the person left. Suddenly, smoke was pouring through the bedroom doorway and immediately appellant was observed by Ms. Sweet standing in the living room doorway staring at the fire which at that point was burning furiously. These facts, coupled with appellant's access to stoddard solvent and his sexual rebuff by Ms. Sweet, and the other evidence discussed above justify the jury's finding that the appellant was guilty of arson.

The appellant further contends that the Commonwealth failed to prove that the solvent used to start the fire came from McCreary Roofing Company's place of business, and therefore the question of his guilt should not have been submitted to the jury. While the Commonwealth did not prove where the solvent came from, this was not an essen-

---

**3.** Appellant's counsel stated in his brief:
 The issue of whether or not the fire was an arson fire was not contested by the defense because the defendant was not charged until March of 1980 and by that time it was too late to attempt to establish whether it was or was not an arson fire.
 Appellant's counsel further stated:
 With these principles applied to the testimony in this case, it is respectfully submitted that the most the Commonwealth established was (1) there was an arson fire; (2) an accelerant was used with chemical properties similar to stoddard solvent; (3) the defendant was in the apartment.

**4.** Circumstantial evidence may be sufficient to permit the inference that the defendant ignited the fire even in the absence of direct evidence that he was at the scene near the time of the fire. *Commonwealth v. DeMartini,* 125 Pa.Super. 392, 189 A. 564 (1937) and *Commonwealth v. Tomaino,* 168 Pa.Super. 505, 79 A.2d 274 (1951).

tial element of its case. It is clear that the appellant as an employee had ready access to the solvent in question and the use of the solvent by the appellant on the night of the fire was completely consistent with his background as a roofer. Guilt need not be proved to a mathematical certainty. *Commonwealth v. Herman,* 271 Pa.Super. 145, 412 A.2d 617 (1979); *Commonwealth v. Williams,* 269 Pa.Super. 544, 410 A.2d 835 (1979). Two cases illustrate how far our courts go in allowing the crime of arson to be proved by circumstantial evidence. *Commonwealth v. Wisneski,* 214 Pa.Super. 397, 257 A.2d 624 (1969), sustained a conviction of arson based solely on circumstantial evidence. The appellant's home burned down five hours after he was observed moving furniture from the house at eleven o'clock in the evening. Some months before the fire he told his wife that he would burn the property. After the fire he told the fire marshall that he had left Philadelphia where his home was located for Absecon two hours before he was seen removing the furniture. The court stated at 214 Pa.Super. 400, 257 A.2d 626: "The fact that the Commonwealth failed to produce direct evidence placing appellant at the scene of the crime within 5 hours of the time of the fire does not vitiate the conviction."

In *Commonwealth v. Smallwood,* 465 Pa. 392, 350 A.2d 822 (1976) the evidence established that the defendant and Mike Baltimore were romantically involved and also that Baltimore and Paula Wagner were living together. A witness overheard the defendant make threats to Baltimore and Wagner because Baltimore would not leave Wagner for the defendant. The building in which Wagner had an apartment was deliberately set on fire and Wagner and Steven Johnson died. Baltimore was also injured as a result of the fire and at the hospital the defendant stated that she was responsible for his being there. The court held that this evidence was sufficient to sustain a conviction of murder in the first degree and arson.

■ Appellant further contends that the court below erred in overruling an objection to part of the Common-

wealth's closing statement which was allegedly based on conjecture and not on any facts relating to motive. The objected to statement by the prosecution was:

Maybe he was upset. Maybe he was upset by the fact that his friend was in bed with his girl and he had just gotten a bath, thinking when he left her in the living room she'd be available to him, thinking that maybe the first pass he made was a little too abrupt, maybe now they'd talk a little.

They sat in here (indicating), smoked a little dope, listened to some tapes and music. Maybe now if he cleaned up things would be different. He comes out the bathroom and sees her. She thinks so much of that stereo that she talks about it—

Counsel for the appellant objected to the remarks and the court overruled the objection but stated to the jury: "It's all argument, ladies and gentlemen, it's for you to decide the facts." Every improper remark made in the course of a trial by counsel does not compel the granting of a new trial. "A new trial is required when the remark is prejudicial; that is when it is of such a nature or substance or delivered in such a manner that it may reasonably be said to have deprived the defendant of a fair and impartial trial." *Commonwealth v. Phillips*, 183 Pa.Super. 377, 382, 132 A.2d 733, 736 (1957). *See also Commonwealth v. Goosby*, 450 Pa. 609, 301 A.2d 673 (1973); *Commonwealth v. Axe*, 285 Pa.Super. 289, 427 A.2d 227 (1981) and cases cited therein; *Commonwealth v. Perkins*, 473 Pa. 116, 373 A.2d 1076 (1977); *Commonwealth v. Smith*, 289 Pa.Super. 356, 433 A.2d 489 (1981); *Commonwealth v. Baranyai*, 296 Pa.Super. 342, 442 A.2d 800 (1982). Further, the prejudicial effect of a district attorney's remarks must be evaluated in the context in which they occurred. *Commonwealth v. Stoltzfus*, 462 Pa. 43, 337 A.2d 873 (1975); *Commonwealth v. Smith*, 490 Pa. 380, 416 A.2d 986 (1980). The complained of remarks by the prosecutor in his closing statement were not prejudicial to the appellant to the extent that he was deprived of a fair trial.

The appellant also contends that the court below committed reversible error when it permitted Detective DePaolo to testify for the Commonwealth as follows:

Q. Now, Detective DiPaolo, on October the 2nd, 1979, while you were present in this conversation with the defendant and in the presence of Assistant District Attorney Shad Connelly, did the defendant direct a question to Mr. Connelly in your presence?

A. Yes, sir, he did.

Q. What was that question?

A. The defendant asked him at this time, what did he think about this case.

Q. And in your presence and hearing did the Assistant District Attorney Connelly respond?

A. Yes, sir.

Q. What was his response?

A. He said, "yes, I think you did it."

Q. What did the defendant respond to Assistant District Attorney Connelly?

A. He told him he was a fucking toad just like us.

■ Appellant contends that the testimony of Detective DiPaolo was so prejudicial that his conviction must be reversed. We do not agree. All the jury learned was that when the appellant asked the assistant district attorney what he thought about the case the district attorney stated that he thought that the appellant committed the crime. It was the appellant who asked the question and he should not complain that the question was not answered favorably to him. As the court below noted, the fact that the answer was not to the appellant's liking is not a grounds for complaint. Even if the admission of the assistant district attorney's answer is deemed to be erroneous, it was harmless error beyond a reasonable doubt. Error is harmless when the record reveals that it did not prejudice the defendant or that the prejudice was so minimal that beyond a reasonable doubt it did not influence the jury. *Common-*

*wealth v. Stetler,* 494 Pa. 551, 431 A.2d 992 (1981). *See also Commonwealth v. Adams,* 296 Pa.Super. 24, 442 A.2d 277 (1982).

■ Appellant also contends that the special prosecutor, Bernard L. Siegel, Esquire, engaged in misconduct by attempting to show that the appellant used Ms. Sweet's car to obtain the stoddard solvent used in the fire.[5] Ms. Sweet testified that before the fire her purse, which contained her car keys, was in the living room and after the fire it was discovered in the kitchen. She also testified that her car was located after the fire in a different place than it had been prior to the fire.[6] The probative value of this evidence was minimal. When asked by the court at side bar what probative value there was in evidence that the car had been moved, the prosecutor replied:

Her purse was in the living room, she finds it in the kitchen, she hadn't brought it there. She parked her car in one place, and the next day when the police go to photograph the scene, which has been identified as being

---

**5.** It is very questionable whether the appellant has preserved the issue of prosecutorial misconduct for appellate review. Only those issues included in post verdict motions will be considered preserved for review. *Commonwealth v. Gravely,* 286 Pa. 194, 404 A.2d 1296 (1979). As noted in *Commonwealth v. Seeley,* 297 Pa.Super. 498, 500, 444 A.2d 142, 143 (1982): "... no specific post verdict motion ever was raised contending that prosecutorial misconduct occurred. Thus, the issue is waived." In his motion in arrest of judgment and for new trial appellant did not allege prosecutorial misconduct. However, he did allege that the argument of counsel was contrary to facts known to the Commonwealth, and that the prosecutor attempted to convey by inference that the appellant used Ms. Sweet's car to obtain stoddard solvent. These allegations are related to conduct which the appellant now contends constituted prosecutorial misconduct and we will consider the issue of such misconduct on the merits. Counsel are cautioned that they run a grave risk of waiver of the issue of prosecutorial misconduct unless the issue is specifically raised in post-verdict motions.

**6.** Ms. Sweet's testimony concerning her car was as follows:
Q. Is that car your white car, is that car, in looking at that picture, (Commonwealth's Exhibit Forty-one) in the same place where you parked it when you came back on August 30th—
A. "No."

a few hours later, eight o'clock the next morning, the car is in another location.

The trial court sustained the appellant's objections to this testimony. Also, defense counsel established in cross-examination of Detective DePaolo that there was no evidence that stoddard solvent had ever been in Ms. Sweet's car nor were the appellant's fingerprints located in the car although a search was made for them. Appellant now contends that the prosecution "succeeded in creating [the] illusion ..." that the appellant left the house to get stoddard solvent "in the face of substantial direct evidence to the contrary [and this] is the worst kind of prosecutorial misconduct imaginable". (Appellant's brief, page 46). The circumstantial evidence indicates that the appellant did in fact leave Ms. Sweet's apartment and subsequently returned with an inflammable solvent which he intentionally poured in the area of the stereo and on the floor. It was not illusory that the appellant obtained the solvent, or a similar type of fire accelerant, although we do not know with certainty where or how he obtained it. We find no evidence for prosecutorial misconduct in the circumstances.

In addition to the above, the appellant would have us find prosecutorial misconduct on the grounds that the prosecutor indicated that the evidence established that the stoddard solvent was available only at the McCreary Roofing Company.[7] In his closing argument the prosecutor stated:

For example, if you hear an argument that a product can be bought anywhere in the city, that's an argument

7. Appellant's counsel makes serious charges about the conduct of the special prosecutor as follows:
 To first misstate that there was no evidence of stoddard solvent being available elsewhere than McCreary Roofing misled a susceptible court to adopt that untrue statement as its own. But even assuming that the special prosecutor and the court honestly did not recall the evidence, the special prosecutor knew that the contention that the only evidence "from the witness stand" was that stoddard solvent came from McCreary Roofing was a false impression it intentionally created since the Commonwealth knew the impression was not true. Guilt or innocence cannot depend on the whim of a prosecutor contending that a jury may convict on false impressions and arguments.

from one of the counsel, and you didn't hear any evidence from the witness stand about that being available any place but one place. Then the facts as you remember it is what counts, that the only evidence is what came from the witness stand.

That was that this product, of course what we're talking about in this case is stoddard solvent. The only evidence you heard is that, at least as far as this case was concerned, it was available at McCreary Roofing. You didn't hear any evidence, and you may recall this differently from me, but you really didn't hear any evidence except in argument, that this is available all over town. You can buy it hundreds of places. That was argument, not a fact.

· · · · ·

He had access to stoddard solvent. He used it at work. No one said he went to McCreary Roofing that night, but where did it come from? That's one of these red flags that says detour, folks, we're going off the road. No one said he went to McCreary Roofing. He didn't have to go there. No one has proven where he's gotten it, that's true. He had access to it. There are a number of ways he could have gotten that stuff.

Remember when he and Jefferson were working on the parts? They were working on what? Parts, transmission, probably needed some cleaning solvent for that. They were dirty, come from work, they could have had some. Could have, you don't even have to worry there. At home, in a plastic container, on the truck. He didn't have to drive to McCreary Roofing to get it. There's no doubt it was stoddard solvent.

■■■ The prosecutor did not contend that the solvent necessarily came from McCreary Roofing Company. He argued that "the only evidence you heard is that, at least as far as this case was concerned, it was available at McCreary Roofing." He also noted "the facts as you remember it [sic] is what counts, that the only evidence is what came from the witness stand." Reading the argument as a whole

we do not find that it constitutes misconduct. The prosecutor did not imply that the only source of the stoddard solvent was at the place of business of McCreary Roofing Company. He argued that there was no evidence to establish that it was available all over town.

Appellant also claims error in that the court below allowed Michael Jefferson to be called as a court witness. The court in its discretion may call a witness as a court witness in the interest of justice. *Commonwealth v. Burns*, 409 Pa. 619, 187 A.2d 552 (1963). *See also Commonwealth v. Rhodes*, 272 Pa.Super. 546, 416 A.2d 1031 (1979). Mr. Jefferson was hostile to the Commonwealth and had given inconsistent statements to the police. Copies of the various statements were given to the appellant's counsel before Mr. Jefferson testified. In his testimony as a court witness Jefferson testified that Mr. DiNicola told him that he was sleeping in the apartment and he "heard all kinds of sparking and loud noises and that's what woke him up." (N.T. 483). The testimony of Mr. Jefferson exonerated appellant from intentionally setting the fire. The prosecution would not call the appellant on direct examination and be bound by his testimony and it was proper for the trial court in the exercise of its discretion to call Mr. Jefferson as a court witness.

Finally, the appellant contends that the trial court erred in failing to charge on involuntary manslaughter as he requested. It was stipulated at trial that three persons died as a result of the fire, Deborah Sweet's two children and Eugene Pitt. The evidence further established that the fire was incendiary in nature having been intentionally and maliciously set and the appellant does not contest this. The fire was ignited or spread by means of an accelerant and if the jury found that the appellant participated in these acts they could not rationally acquit him of murder and find him guilty of involuntary manslaughter. The trial court should not instruct the jury on legal principles which have no application to the facts presented at trial. *Commonwealth v. Tervalon*, 463 Pa. 581, 345 A.2d

671 (1975). As stated in *Commonwealth v. White*, 490 Pa. 179, 185, 415 A.2d 399, 402 (1980):

> To this end and to *finally* clarify this situation, we now hold that in a murder prosecution, an involuntary manslaughter charge shall be given only when requested, and where the offense has been made an issue in the case and the trial evidence reasonably would support such a verdict.

*See also Commonwealth v. Pfaff*, 496 Pa. 572, 437 A.2d 1188 (1981); *Commonwealth v. Keaton*, 494 Pa. 566, 431 A.2d 999 (1981). There was no evidence that the fire in this case was caused by negligent or reckless acts, and involuntary manslaughter was not made an issue in the trial. Accordingly, the trial court properly refused to charge on the issue of involuntary manslaughter.

Judgment of sentence affirmed.